CIBA-GEIGY CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2831–78.     Filed August 1, 1985.

*Wayne E. Chapman, Richard L. Hoffman, Douglas R. Cox, Stephen D. Poss, Robert L. Nowicki,* and *Henry B. Gutman,* for the petitioner.

*Stanley J. Goldberg, David M. Brandes,* and *Richard M. Duncan,* for the respondent.

NIMS, *Judge*: Respondent determined deficiencies in petitioner's income taxes and liabilities for withholding of income

---

[7]See also *Day v. Commissioner*, T.C. Memo. 1985–251.

taxes at the source in the amounts and for the taxable years, as follows:

| TYE | Income tax deficiencies |
|---|---|
| Dec. 31, 1965 | $4,497,101.75 |
| Dec. 30, 1966 | 5,869,605.06 |
| Dec. 29, 1967 | 9,027,112.01 |
| Jan. 3, 1969 | 12,211,807.46 |
| Dec. 26, 1969 | 23,487,352.55 |
| Total | 55,092,978.83 |

| TYE | Liabilities for withholding income taxes at source |
|---|---|
| Dec. 31, 1965 | $468,448.09 |
| Dec. 31, 1966 | 611,417.19 |
| Dec. 31, 1967 | 940,324.16 |
| Dec. 31, 1968 | 1,156,421.15 |
| Dec. 31, 1969 | 1,415,440.02 |
| Total | 4,592,050.61 |

The foregoing deficiencies and liabilities reflect amounts determined in a deficiency notice, a statutory notice of liability, and an amended answer, as follows: In respondent's statutory notice of deficiency, dated December 23, 1977, deficiencies were determined in petitioner's income taxes for the taxable years and in the amounts, as follows:

| TYE | Income tax deficiencies |
|---|---|
| Dec. 31, 1965 | $3,345,184.80 |
| Dec. 30, 1966 | 4,147,053.36 |
| Dec. 29, 1967 | 6,331,047.37 |
| Jan. 3, 1969 | 8,071,319.51 |
| Dec. 26, 1969 | 17,844,438.00 |

Respondent also issued a statutory notice of liability for withholding of income taxes at the source on December 23, 1977, as follows:

| TYE | Liabilities for withholding income taxes at source |
|---|---|
| Dec. 31, 1965 | $348,457 |
| Dec. 31, 1966 | 432,032 |

|  |  | Liabilities for withholding income |
|---|---|---|
| TYE |  | taxes at source |
| Dec. 31, 1967 | ........ | $659,484 |
| Dec. 31, 1968 | ........ | 764,330 |
| Dec. 31, 1969 | ........ | 881,073 |

Respondent's statutory notice of deficiency disallowed a portion of the agricultural chemical royalties paid by petitioner to its parent company. Respondent reduced petitioner's claimed 10-percent royalty rate to a 6-percent royalty rate, which 4-percent reduction resulted in the disallowance of the following amounts of royalties:

|  |  | Amounts |
|---|---|---|
| TYE |  | of royalties disallowed |
| Dec. 31, 1965 | ....... | $1,654,712.54 |
| Dec. 30, 1966 | ....... | 2,433,541.00 |
| Dec. 29, 1967 | ....... | 3,804,337.08 |
| Jan. 3, 1969 | ....... | 5,343,224.60 |
| Dec. 26, 1969 | ....... | 7,417,190.55 |
| Total | ....... | 20,653,005.77 |

In an amended answer, respondent sought to disallow the previously allowed and remaining royalties paid by petitioner to its parent company. As set forth in the amended answer on November 30, 1982, the proposed additional disallowances were as follows:

|  |  | Additional amounts |
|---|---|---|
| TYE |  | of royalties disallowed |
| Dec. 31, 1965 | ....... | $2,399,826.98 |
| Dec. 30, 1966 | ....... | 3,587,711.89 |
| Dec. 29, 1967 | ....... | 5,616,801.34 |
| Jan. 3, 1969 | ....... | 7,841,833.13 |
| Dec. 26, 1969 | ....... | 10,687,337.52 |
| Total | ....... | 30,133,510.86 |

Based on these proposed additional disallowances respondent asserted increased deficiencies in petitioner's income taxes as follows:

|  |  | Amounts of deficiencies |
|---|---|---|
| TYE |  |  |
| Dec. 31, 1965 | ....... | $1,151,917.15 |
| Dec. 30, 1966 | ....... | 1,722,101.70 |

| TYE | | | Amounts of deficiencies |
|-----|---|---|---|
| Dec. | 29, | 1967 | $2,696,064.64 |
| Jan. | 3, | 1969 | 4,140,487.95 |
| Dec. | 26, | 1969 | 5,642,914.55 |

Petitioner asserted in its petition a setoff claim against respondent's proposed section 482 allocation. Petitioner asserts this claim on the ground that an unrelated third party dealing at arm's length with petitioner's Swiss parent corporation would have been willing to pay a 15-percent royalty rate for the triazine licensing rights involved in this case. Based on this proposition, petitioner alleges entitlement to an increased annual deduction for additional royalties payable to its parent. Petitioner calculated the amounts of these deductions as follows:

| TYE | | | Amounts asserted to be deductible |
|-----|---|---|---|
| Dec. | 31, | 1965 | $2,068,390 |
| Dec. | 30, | 1966 | 3,041,925 |
| Dec. | 29, | 1967 | 4,755,451 |
| Jan. | 3, | 1969 | 6,679,061 |
| Dec. | 26, | 1969 | 9,271,487 |
| | Total | | 25,816,314 |

After concessions, the issues for decision are:

(1) Whether royalty payments made by petitioner to its Swiss parent corporation in exchange for licensing rights to make, use, and sell triazine herbicides in the United States were excessive under the arm's-length standard of section 482[1] and therefore subject to reallocation; and

(2) Whether royalty payments disallowed by respondent constitute dividends subject to the section 1442(a) 5-percent withholding of income tax at the source.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulations and their attached exhibits are incorporated herein by this reference.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 in effect for the years in question. All Rule references are to the Tax Court Rules of Practice and Procedure.

Petitioner Ciba-Geigy Corp. (Ardsley or petitioner), a New York corporation, had its principal place of business in Ardsley, New York, at the time of filing its petition in this case. Petitioner is an accrual basis taxpayer. For all taxable years in issue, petitioner utilized a 52- 53-week year as its taxable year except for the year 1965 when it used a calendar year.

## 1. Organizational Histories of Petitioner and Swiss Parent Company

The Swiss parent company of Ardsley was founded in Basle, Switzerland, in 1758 as a family-operated trading company specializing in imported dyestuffs. By the mid-1860s, the company commenced production of synthetic aniline dyes. In 1862, it built a factory in Basle to assure volume production capability of the synthetic aniline dyes. Beginning in the late 1860s, the parent company established an experimental chemical laboratory at its Basle facility; it has maintained this laboratory to the present time. Prior to 1870, the parent company had built a network of central and western European sales agents and representatives to distribute its products; in the 1870s, it expanded this network to include various European countries, India, the Far East, and the United States.

On January 1, 1901, the original parent company was reorganized from a family operation into a joint stock company, and in 1914 it adopted the name of J. R. Geigy S.A. In 1903, the original Swiss parent company organized the Geigy Aniline and Extract Co. (GAE) as a wholly owned subsidiary to market and sell its products in the United States. In 1909, Geigy-ter-Meer Co., later Geigy Co., Inc., was organized in New York to succeed GAE. In 1952, the assets of Geigy Co., Inc., were acquired by petitioner, a newly formed corporation incorporated under the name Geigy Chemical Corp. as a wholly owned subsidiary of J.R. Geigy, S.A. In 1956, petitioner's principal place of business was moved from New York City to Ardsley, New York.

In October 1970, J. R. Geigy, S.A., merged with another Swiss chemical and pharmaceutical company, Ciba, Ltd., to form Ciba-Geigy, Ltd. (Geigy-Basle). At the same time, Ciba Corp., a wholly owned subsidiary of Ciba, S. A., merged into

petitioner. At that time, petitioner's name was changed to Ciba-Geigy Corp.

Petitioner was exclusively a dyestuffs and dyestuffs auxiliary marketing company until 1943; it did not have manufacturing or research capability. Petitioner mixed the dyestuffs and auxiliary products purchased from Geigy-Basle and from another company, Cincinnati Chemical Works. Petitioner shipped the finished mixed product from its central shipping facility in Bayonne, New Jersey, to its U.S. customers.

By 1943, Geigy-Basle has created the insecticide chemical DDT and had applied for a patent in the United States. Because the U.S. Government viewed DDT as "potentially significant" to its military operations during World War II, it placed DDT and its related chemical compounds under U.S. governmental control and secrecy requirements. During the War, the U.S. Government required Geigy-Basle to grant licenses under its pending U.S. DDT patent application to a number of U.S. companies for the manufacture and sale of DDT to the Government. In 1943, Geigy-Basle transferred its rights under the pending U.S. DDT patent application to petitioner. Petitioner established a manufacturing and sales licensing program to supply DDT to the U.S. Government; under this program, petitioner licensed such companies as Du Pont, General Chemical, and Hercules. On August 31, 1945, the U.S. Government released DDT from military control. Petitioner began expansion of its DDT-licensing program and ultimately licensed over 800 firms to manufacture and sell DDT. However, petitioner also marketed its own DDT formulations and thus remained in direct competition with its licensees.

Ardsley found it difficult to compete with its licensees which were large chemical manufacturers and producers. Many licensees offered "full lines" of agricultural chemical products including insecticides, fungicides, and inorganic herbicides. As a result of the stiff competition, petitioner embarked on a program to expand its stance in the agricultural chemical field. It decided to obtain nonexclusive licenses that cumulatively would enable it to offer a full line of agricultural chemical (agchem) products. Petitioner purchased the active ingredients for such agchem products from third parties in the United States, formulated them into finished products under Geigy-Basle labels, and sold them to independent dealers and

distributors. Under its expanded program, petitioner offered approximately 30 to 40 active ingredients formulated into approximately 120 products.

In 1949, petitioner expanded its sales operations to include the sale of Geigy-Basle's pharmaceutical products; petitioner did not engage in manufacturing or research in the pharmaceutical field. In the 1950s, petitioner expanded into the manufacture of industrial chemicals.

As a result of petitioner's expansion program, it realized rapid increases in annual sales from a low of $1.8 million in 1947 to a high of $11.8 million in 1951. Petitioner's annual sales declined after the end of the Korean War. Petitioner was not ranked among the top 10 U.S. producers or marketers of agricultural chemicals prior to 1958. Although petitioner realized periods of expansion and decline of annual sales from 1947 through 1958, its Agricultural Chemicals Division consistently lost money from 1944 through 1958, with the exception of 1951 when the division reported a modest profit. The poor financial performance of the agricultural chemicals division concerned petitioner's management. Dr. George Ferguson was appointed president of petitioner's insecticide division (later known as the agricultural chemicals division) in 1953. Dr. Ferguson attempted to change the financial picture of the insecticide division and decided to retrench. He abandoned petitioner's marketing of its full line of nonproprietary agricultural chemical products, sold its agricultural chemical formulating plants, and eliminated some personnel and branch offices.

## 2. Chemical Research Capabilities of Geigy-Basle and Petitioner by 1950

Between World War I and World War II, Geigy-Basle expanded its staff of chemists and developed its chemical research in the areas of synthetic tanning agents, industrial chemicals, pharmaceuticals, and pesticides. This chemical research expansion resulted in the invention and commercialization of numerous chemicals, including DDT. Discovery of DDT and its widespread use during World War II propelled Geigy-Basle into the field of synthetic pesticides. As a result of intensive research in this field in the 1940's and 1950's, Geigy-Basle developed and commercialized such synthetic chemical

pesticides as: (a) kik, an insect repellant; (b) gesin, an herbicide; (c) dimetan, pyrolan, pyramate, isolan, and diazinon, various insecticides; (d) etoxilon and chlorobenzilate, two acaricides; (e) tomorin, a rodenticide; and (f) mesulfan, a fungicide. By 1951, Geigy-Basle had established a long and excellent track record on research and development of insecticides, miticides, fungicides, and rodenticides.

By 1953, Geigy-Basle had approximately 45 foreign subsidiaries and had built a sizable network of third-party licensees to handle marketing and sales of pest control and other chemicals. Since 90 percent of Geigy-Basle's output was exported for sale outside Switzerland, these subsidiaries and licensees were important to Geigy-Basle's worldwide sales. Although a major role of Geigy-Basle's subsidiaries and licensees was the sale of Geigy-Basle's products, some of these subsidiaries and licensees also either manufactured Geigy-Basle's product or acquired active ingredients from Geigy-Basle and formulated them into finished products for distribution, or both.

Geigy-Basle's research facilities in or near Basle had grown to include a microanalytical laboratory for verification of chemical compounds and for analysis of formulation, a kilo laboratory for production of experimental compounds in large quantities, a facility for the study of chronic and subchronic toxicity of experimental chemical compounds, facilities for analyzing chemical residues in soils and plants, a pilot plant to develop commercially practical methods for producing experimental compounds in commercial quantities, an application department to develop effective chemical formulations and to explore combinations of experimental compounds, a chemical research library, a scientific literature service, and a patent department to administer corporate patents and patent applications. Geigy-Basle also maintained greenhouses and an experimental garden and field for small plot field testing. Large-scale field testing was accomplished on several farm sites nearby, including Schweizerhalle and Pfeffingen.

By 1950, Geigy-Basle's research staff included approximately 50 chemists (specialists in synthetics with Ph. D. degrees) and their support staffs. These chemists developed, experimented with, and tested numerous pesticides. It was not unusual for these chemists to call upon other chemists at the University of Basle to assist with Geigy-Basle's research needs.

Among the most important Geigy-Basle chemists and biologists were Dr. Albert Gast, Dr. Enrico Knuesli, and Dr. Hans Gysin.

Dr. Albert Gast[2] joined Geigy-Basle on February 1, 1943, as a biologist. Among his early assignments were the biological testing of DDT products and the testing of experimental insecticides and fungicides for phytotoxic activity on plants. From 1946 to 1948, he screened chemical compounds at Basle, hoping to identify some herbicides related to, but having advantages over, 2,4-D, an herbicide used on corn and other crops. This screening program resulted in a chemical product known as gesin. Thereafter, Dr. Gast continued testing insecticides and fungicides for their phytotoxic activities on plants. In 1951, Dr. Gast worked on Geigy-Basle's herbicide-defoliant project at Schweizerhalle; he designed a primary screening program[3] to biologically test the compounds synthesized for that project.

Dr. Enrico Knuesli[4] was hired in the autumn of 1951 to work as a synthesis chemist for Geigy-Basle; he commenced work in March 1952. Dr. Knuesli was assigned to a synthesis group headed by Dr. Gysin which worked in the pesticide field. Dr. Knuesli was involved in the herbicide-defoliant project during the mid-1950's.

Dr. Hans Gysin[5] commenced work for J. R. Geigy, S.A., on

[2]Dr. Albert Gast received his Ph.D. degree in botany with a major in plant physiology from the University of Basle in 1941. His doctoral dissertation was a study of the influence of plant growth substances on the root growth of corn. Dr. Gast has been a member of the Swiss Botanical Society since 1941.

[3]Primary screening is a relatively routine testing process. It is usually performed in a greenhouse by a technician who is supervised by a biologist. The general purpose of primary screening is to determine which chemical compounds are biologically and herbicidally active, and thus deserving of additional testing. Primary screening can take the form of pre-emergence or post-emergence testing at selected dosages. In pre-emergent primary screening, generally a flat is sown with seeds, and a chemical solution either is mixed or is drenched into the soil. In post-emergent primary screening, the chemical solution is sprayed onto the growing weeds after they have reached a certain growth height. Observations are made of the drenching and spraying effects.

[4]Dr. Enrico Knuesli received his Ph.D. degree in chemistry from the Federal Institute of Technology in Zurich, Switzerland, in 1948. Dr. Knuesli completed 4 years of postdoctorate study at the Instituto Superiore Di Sanita, the Italian Institute of Health, in the fields of curariactive compounds and cardiotonics. During Dr. Knuesli's postdoctoral work, he submitted his synthesized pharmaceutical compounds to pharmacologists and M.D.'s on the research team who tested the compounds on animals.

[5]Dr. Hans Gysin received his Ph.D. degree from the University of Basle in 1938. His major was in organic chemistry and his minors were in inorganic chemistry, physical chemistry, and mineralogy. Dr. Gysin was promoted regularly during the 1940's, 1950's, and 1960's. Following a corporate reorganization of Geigy-Basle in 1968, Dr. Gysin became an assistant head of the agricultural chemical chemistry research division (Agchem). His responsibilities included re-

July 1, 1938, as research chemist in the pharmaceutical research department. Dr. Gysin was promoted to research group leader in approximately 1945, and his research group became involved in insecticide research in 1948. His research group expanded into fungicides in 1949 and into herbicides in 1951. Dr. Gysin became the head of Geigy-Basle's agricultural chemical chemistry research department (Agchem) in 1955. He was promoted to the head of Geigy-Basle's entire Agchem research department in 1957 and was a member of Basle's technical committee which reported directly to top management.

Petitioner opened its Bayonne, New Jersey, laboratory on the grounds of the Bayonne dyestuff mixing and central shipping facilities in 1946. The original purpose of the laboratory was to provide to petitioner's insecticide department technical service[6] and formulation support with regard to the chemical compound DDT. Between 1946 and 1951, the laboratory's activities expanded to provide technical service and fomulation work for numerous chemical compounds for the pharmaceutical department. It was not until the mid-1950's that personnel at the Bayonne laboratory engaged in basic research, chemical synthesis, primary screening, or microanalytical work.

In the early 1950's, petitioner developed as two major capabilities the formulation of various agricultural chemicals[7] and pharmaceutical sales. Additionally, it operated a farm in Elkton, Maryland, for the purpose of field testing pesticides.

Petitioner employed a number of chemists, biologists, and scientific assistants in the 1950's, including Dr. George Ferguson, Dr. Joe Antognini, Herb Day, and Jim Flanagan. Dr. Ferguson[8] commenced work at the Bayonne, New Jersey,

---

search, development, marketing, and logistics. In 1969, Dr. Gysin became the executive head of Geigy-Basle's Agchem division.

[6]Technical service involves handling customers' complaints, requests, and correspondence; providing technical data and sales literature; and conducting field tests of formulations of commercialized products.

[7]Petitioner had 10 formulating plants located in Lockridge, Iowa; Houlton, Maine; Elkton, Maryland; McGregor, Texas; Aberdeen, North Carolina; Orlando, Florida; Lelan, Mississippi; Fresno, California; Walla Walla, Washington; and Colorado Springs, Colorado. Pursuant to Dr. Ferguson's retrenchment program, in late 1955, petitioner sold its 10 formulating plants.

[8]Dr. Ferguson received his Master of Science degree in entomology in 1939 from Oregon State University and his Ph.D. degree in entomology from Ohio State University in 1941. From 1943 through 1945, Dr. Ferguson was a research fellow at the Crop Protection Institute in New Hampshire.

facility in April 1945, as chief entomologist. Among Dr. Ferguson's early responsibilities was the commercial development of DDT for agricultural and other uses. From approximately 1947 to 1953, Dr. Ferguson was technical director of petitioner's insecticide department; his duties consisted of supervising the formulation of DDT products, third-party products, and the Bayonne laboratory. From 1953 to 1969, Dr. Ferguson was president of petitioner's Agchem division. Dr. Antognini[9] was hired by petitioner in 1951 as a synthesis chemist. Dr. Antognini reported directly to Dr. Ferguson or Dr. Ferguson's assistant, Mr. C.C. Alexander. Dr. Antognini worked on the herbicide-defoliant project and initiated its primary screening program for petitioner. Dr. Antognini left petitioner's employ in fall, 1954. Herb Day and Jim Flanagan were hired by petitioner to assist in the herbicide-defoliant project screening process from 1952 through 1955.

## 3. Herbicide-Defoliant Project

On the invitation of Mr. Dieter Burckhardt, head of Geigy-Basle's Pesticide Sales Department, Dr. Ferguson visited Geigy-Basle in September 1950. One purpose of this visit was to discuss the chemical "mitin." While in Switzerland, Dr. Ferguson toured Geigy-Basle's facilities, including its chemical laboratories at Schweizerhalle. Dr. Ferguson was asked to give an impromptu speech; he spoke on U.S. agricultural trends and on the U.S. market for agricultural chemicals.[10] Dr. Ferguson generally described the state of the insecticide and acaricide fields in the United States and trends towards monocultures and mechanization. During his Swiss visit, Dr. Ferguson invited Dr. Gysin to visit the United States to observe the U.S. agricultural chemicals market and to consider its potential. Dr. Gysin was receptive and both men decided to pursue the proposed visit with their respective managements.

[9]Dr. Antognini received his degree in plant sciences from the University of California at Davis, California, in 1948. He received a Ph.D. degree in horticulture from Cornell University in 1951. His major study at the universities was in vegetable crops. After leaving the employment of petitioner in fall, 1954, Dr. Antognini worked for Stauffer Chemical Co.

[10]As a result of increased mechanization and fertilizers used in the United States, the U.S. agricultural production of corn and other crops had increased since World War II. Many people viewed the 1950's as the time to develop herbicides to treat the increasing crop acreage.

Following his Swiss trip, Dr. Ferguson wrote a letter, dated January 4, 1951, to Charles Koechlin, president and chairman of the Geigy board of trustees and chairman of the Ardsley board of trustees. Dr. Ferguson commented in his letter on the "possibility of setting up a basic research project on the development of new defoliants and herbicides in the U.S." The letter explained that existing herbicides were unsatisfactory for use on U.S. crops of cotton, soybeans, alfalfa, and corn. Dr. Ferguson stated his belief that there was great opportunity for profitable research in the defoliant and herbicide fields. Dr. Ferguson stated that—

The primary objective of research work in this field is, of course, the discovery and development of patentable new compounds and products that may be commercially useful * * *. Since defoliation is biologically an herbicidal action, no distinction should be made in the basic research program between the two. The distinction will come about naturally during the development and test program of any compounds that show activity of interest.

The procedure to be followed would consist of three steps:

1-Chemical synthesis of the compounds.
2-Screening tests on several types of plants to determine biological activity.
3-Survey tests in the field to determine range of usefulness.

Compounds showing promising results would then be subjected to full scale field evaluation in cooperation with federal and state experiment stations.

Dr. Ferguson proposed that the research team should be composed of a chemist, an agronomist, and a greenhouse assistant. He indicated that the physical plant at the Bayonne Laboratory would be adequate to undertake the project. He estimated an annual budget of $30,000 to employ personnel and to cover supplies, overhead, travel, and contingencies. Dr. Ferguson recommended that such a program—

should be set up on no less than a 5 year basis * * *. [i]n order to tie the program in closely with Basle's basic research program, it is suggested that one of your experienced chemists might take over the chemical side of the project. Close liaison could then be easily maintained as well as bringing all applicable research methods to bear on the problem as such methods have been developed in Basle.

On February 14, 1951, Dr. Gysin wrote a memorandum in which he recommended a 5-year program to find and produce superior and cheaper chemical compounds for use as weed

killers and defoliants. Dr. Gysin stated that from 1946 through 1948 numerous compounds were investigated for use as weed killers; none showed satisfactory results in the field. Therefore, Dr. Gysin stated:

Since our weeds in Switzerland are very different from those in the U.S.A., and since this is provisionally a problem whose solution chiefly interests the United States, only New York comes under consideration for testing. In order to lose no time, Geigy-New York would have to be capable of testing substances as early as the spring. The delivery of these substances as models could take place from Basle in the next few months. A definitive taking up of chemical research in the U.S.A. should be out of the question because of insufficient laboratory facilities and also because of a lack of suitable chemists and auxiliary personnel. If for external reasons a shift of part of the chemical research to the U.S.A. should become necessary, then laboratory buildings would be a prerequisite. Until the realization of such a project, more could be accomplished from Basle, in my opinion (if necessary, two to three chemists could be used for this work), and if nothing positive were to come out of this line of work in a few years, then our chemists could be otherwise employed and the biologists in the U.S.A. could work for sales or be discharged. * * *

At the end of the memorandum, Dr. Gysin set forth immediate measures to be taken by Giegy-Basle and by Ardsley, as follows:

### 4. *Immediate Measures.*

*For Basle:*

(a) Production of a literature and patent inventory concerning the herbicide area, including the true growth substances, the mono-and dicotyledon herbicides and defoliants (will be completed by February 15, 1951 by Dr. Oeschger and Mr. Spindler).

(b) Selection of substances. There is available a list of about 40 substances which are ready for shipment by February 15.

(c) Production of a number of compounds, which are proposed for this area according to the latest state of technology, as well as synthesis of some substances which should lead us away from what is known.

(d) Designation of an office for coordination, to which maintenance of contact between the chemistry department in Basle and development work in New York will be assigned.

*For New York:*

(a) Employment of a suitable biologist and an appropriate assistant for the coming spring.

(b) Carrying out of the known laboratory test for herbicides.

(c) Development of a laboratory test for defoliants.

(d) Initiation of field tests for several monocultures, especially cotton and potatoes, for weed control.

(e) Initiation of field tests with substances that have shown themselves to be possible defoliants in the laboratory.

*For Basle and the U.S.A.:*

Thorough discussion of problems between Dr. Ferguson and the further testing stations (possible national institutes) and a representative of the chemical department in Basle (already planned for) in the course of this year.

Make proposal for further work at the end of these personal contacts or after conclusion of the first season of testing.

In the late 1950's or early 1951, Dr. Gysin commissioned Geigy-Basle's staff to study publications to determine existing organic and inorganic herbicide compounds and research methods before embarking on research for the herbicide-defoliant project. Mr. Max Spindler completed this study in March 1951. The study found that the leading chemical herbicide group produced in 1950 was the 2,4-D-type herbicides which were effective against broadleaf weeds. The study also showed that IPC-type herbicides were available and effective against grassy weeds. The study further determined that Geigy-Basle had the necessary facilities and capabilities to undertake a herbicide research project. Geigy-Basle's available capability and facilities included general research know-how; experience in, and facilities for, synthesis and biological screening for pharmaceuticals and pesticides; auxiliary services such as analytical, toxicology, pharmacology, and kilo laboratories; a pilot plant operation; patent services; and an extensive scientific library.

In March 1951, Dr. Gysin sent to petitioner a selection of chemical compounds for future testing. Dr. Gysin never saw a report from Dr. Antognini on his test results on these compounds.

In the summer of 1951, Dr. Gysin traveled through the United States escorted by Dr. Ferguson and Mr. Alexander. The focus of Dr. Gysin's travel was threefold: (1) To gather information on agricultural chemicals generally, including insecticides, fungicides, acaricides, and herbicides; (2) to monitor DDT's performance; and (3) to become aware of the performance of Geigy-Basle's new acaricides, insecticides, and pharmaceuticals in the United States. Dr. Gysin visited U.S. Department of Agriculture and other agricultural experimental stations, dealers, distributors, corn fields, farms, and farm cooperatives in the midwest, southwest, and western United

States. Dr. Gysin observed defoliant tests on cotton, the irrigation and nonirrigation of cotton, growth of apple orchards, work performed using DDT-impregnated wood as a means of preventing termite infestation, etc.

Toward the end of Dr. Gysin's visit in the United States, petitioner's board of trustees met on October 2, 1951. The persons present from Ardsley included Dr. Ferguson, Mr. Alexander, and Mr. Suter, Ardsley's executive vice president. From Geigy-Basle, Dr. Gysin, Dr. H. Koechlin, vice president in charge of research and production, and Dr. R. Wiesmann, in charge of Geigy-Basle's biological research department, attended. The minutes of the October 2, 1951, meeting, dated October 22, 1951, showed: (1) Dr. Ferguson's revised belief that the chemical work on the herbicide-defoliant project should be confined to Basle; (2) the suggestion that screening for herbicidal and defoliation effects should be performed first in Basle and that only those compounds showing biological activity should be sent to Bayonne for testing; (3) recognition that Geigy-Basle and Ardsley would utilize different test methods, different test plants, and different views in evaluating the compounds; (4) agreement that compounds in each chemical group studied in Geigy-Basle would be sent to Bayonne for testing, regardless of the biological activity shown by Geigy-Basle's tests; (5) agreement that Ardsley's and Geigy-Basle's first work would be the development of rapid screening test methods for the evaluation of chemical compounds; (6) agreement that the chemical compounds which showed sufficient laboratory and greenhouse activity would be sent to Ardsley for field testing; (7) recognition that after Ardsley obtained patent clearance, it would be responsible for sending the compounds to the appropriate Federal and State experimental stations; (8) agreement that close contact between Geigy-Basle and Ardsley was essential; this resulted in a recommendation for frequent trips by the project's researchers; (9) discussion of the advantages of a small, active, research nucleus in the United States consisting of at least a senior research chemist from Geigy-Basle; (10) deferral of resolution of the issue concerning whether basic agricultural chemical research should be undertaken in the United States; and (11) the stated aim of the herbicide-defoliant project to be the search for all chemical compounds with plant growth influencing activity.

Dr. H. Koechlin placed Dr. Gysin in charge of the herbicide-defoliant project. Dr. Knuesli was selected to perform the project's synthesis work for Geigy-Basle.

As an initial step in the herbicide-defoliant project, Dr. Gysin formulated a plan to synthesize various chemical compounds.[11] The purposes of Dr. Gysin's plan were to limit the number of chemical compounds to be tested and to define the herbicidal effect for which he was searching. Dr. Gysin selected approximately 25 different chemical groups to investigate as potential herbicides. He gave preference to 7 of the 25 groups, including the: carbamates, chlorophenyl acetic acid-type compounds, chlorophenol derivatives, chloroanilino-type compounds, cinnamic acid derivatives, cyanuric chloride derivatives, and ureas. These groups were selected because they were structurally related to such existing herbicides as 2,4-D, IPC, and CMU. Dr. Gysin included cyanuric chloride derivatives based on his knowledge from the pharmaceutical and the dyestuffs fields. He hoped that the urea bridge of a herbicide of the CMU-type compound might be substituted to obtain an herbicidally active triazine. Dr. Gysin hoped to find that, unlike 2,4-D and other existing herbicides, urea-derived herbicides might control both grassy and broadleaf weeds.

Dr. Gysin's chemical synthesis plan served as a framework for Dr. Knuesli to perform the actual chemical synthesis work. Dr. Knuesli reviewed Dr. Gysin's plan and concluded that the plan included a bias or assumption toward synthesizing compounds that included an aryl substituent. After Drs. Knuesli and Gysin discussed the chemical groups included in Dr. Gysin's plan, Dr. Knuesli decided that the synthesis plan needed expansion to include chlorazine compounds.

Before Dr. Knuesli embarked on the synthesis of a particular compound, he determined whether the prospective compound previously had been described in scientific literature.[12] If the prospective compound had not been described previous-

---

[11]Dr. Knuesli explained at trial that chemical synthesis "means to react two chemical entities in order to get out from the reaction of these two, a new chemical." The new chemical may be reacted with others to produce new desired chemical compounds. Prior to the actual synthesis process, the chemist determines the use for which he is seeking to synthesize the chemical compounds.

[12]A chemical compound described in the literature would generally give its physical characteristics and indicate how it was synthesized. The compound might be described in the literature even though it did not have known herbicidal properties.

ly, he considered synthesizing it; if the compound had been described, he might synthesize it anyway.

After Dr. Knuesli synthesized particular compounds, he also evaluated their approximate solubilities. This solubility information was intended to benefit the biologist who later would screen the compounds for biological activity. Dr. Knuesli maintained the synthesis process and the solubility information regarding the synthesized compounds in his laboratory notebook.

After Dr. Knuesli synthesized a chemical compound, he routinely sent a sample to Geigy-Basle's microanalytical group for verification that the molecular content of the synthesized compound matched the molecular content of the compound that he had intended to synthesize.[13] Dr. Knuesli then assigned a code number to the synthesized compound and divided the compound sample into two parts; one portion to be sent to Dr. Antognini at Bayonne and one to be given to Dr. Gast at Geigy-Basle for biological screening. The amount of the chemical sent to Dr. Antognini and to Dr. Gast varied from compound to compound.

Dr. Gast designed and supervised Geigy-Basle's primary screening program for the herbicide-defoliant project. The purpose of his primary screening program was to show which compounds produced phytohormonal activity. His screening plan included the use of known herbicides as standards against which to test the effects of various compounds for suitability as herbicides on a variety of greenhouse test plants. Dr. Gast used solvents or emulsifiers to apply the synthesized compounds to the test plants. Dr. Gast performed his work on the project at Schweizerhalle's facilities, which included a lab, two greenhouses, and two experimental gardens.[14]

Dr. Gast performed four primary tests including a soil germination test, a watering test, a burning test, and a phytohormone test. Dr. Gast investigated the potential epinas-

---

[13]This verification process was performed prior to primary screening.

[14]At the commencement of the project, Dr. Gast was the only Ph.D. who performed biological screening for the project. He had one trained laboratory aide, one to two laboratory helpers, and a gardening group of three gardeners plus one to two apprentices. Dr. Gast could call upon personnel at the Schweizerhalle facility. In 1955, Dr. Grob, a Ph.D. biologist and his assistants tested compounds for the project in the Rhone Valley.

tic[15] and phytohormonal[16] activities. Dr. Gast's primary screening test methods were conducted as follows:

| Test | Factor | Basle |
|------|--------|-------|
| Soil germination[17] | Application method | Soil incorporation |
| | Plant species | Cucumbers<br>Mustard<br>Oats<br>Onions |
| | Replications | 1 |
| | Rating system | Percent germination |
| | | Height of plants |
| Watering test | Application method | Watered emulsion |
| | Plant species | Oats or wheat<br>Mustard<br>Tomatoes |
| | Replications | 1 |
| | Application rate | $1.0 + 0.2 \text{ g/m}^2$ |
| | Rating system | No indication |
| Burning test | Application method | Emulsion sprayed on plants when they have 2 to 4 leaves |
| | Plant species | Oats<br>Mustard |
| | Replications | 1 |
| | Concentration | 1% |
| | Rating system | 0–+++ (0 = no burns)<br>+++ = 100% of plants burned |

---

[15]Epinastic activity is a twisting or misshaping of the plant caused by a chemical agent.

[16]Phytohormonal activity "reflects a special picture of activities. For example, plants treated with phytohormones * * * start curling." Phytohormonal activity also may affect the size of roots and their growth.

[17]Dr. Gast observed the plants and rated the effects of the herbicides after 10 and 20 days. Two weeks later he observed the plants to determine if the compounds showed any delayed effects.

| Test | Factor | Basle |
|------|--------|-------|
| Phytohormone test | Application method | Apply 2 to 3 drops of olive oil solution on stem of plants |
| | Plant species | Beans |
| | Replications | 1 (3 to 4 plants) |
| | Rating system | 0–+++ (0 = no reaction) |

Dr. Gast often communicated his primary screening test results to Dr. Knuesli. Dr. Gast prepared written reports on each compound; these reports were translated and sent to Dr. Antognini.

If Dr. Gast determined that a compound merited further testing because the primary screening test showed biological activity, he performed secondary screening tests.[18] The purpose of Dr. Gast's secondary screening tests was to obtain information about specific plants' tolerances to selected chemical compounds at certain dosage rates. Thus, Dr. Gast used the same chemical compounds in his primary and secondary screening tests, but in the latter tests, he applied differing dosages of the compounds to the test plants. Dr. Gast's secondary screening tests can be summarized as follows:

| Factors | Basle |
|---------|-------|
| Application method | Water emulsion |
| Crop species | Wheat |
| | Mustard |
| | Clover |
| | Carrots |
| Weed species | None |
| Replications | 1 at 1 cm. seed depth |
| | 1 at 3 cm. seed depth |
| Application rate | 0.5 g/m² (4.5 lbs/A) |

[18]The general purpose of secondary screening tests is to uncover more information on a compound's herbicidal properties detected through primary screening tests. Varying dosages of chemical compounds are applied to plants to show crop selectivity (i.e. whether particular plants show a tolerance to a specific chemical compound). These tests usually are performed in a greenhouse; however, on occasion they are performed outdoors on small plots.

| Factors | Basle |
|---|---|
| Time of application | Unknown |
| Number of seeds | Unknown |
| Containers | Unknown |
| Application method | Hand sprayer |
| Notes on: | Destroys<br>Twisting of leaves |

Dr. Gast performed the secondary screening tests between April 22, 1952, and February 11, 1953. Dr. Gysin and Dr. Knuesli observed Dr. Gast's secondary test results at the greenhouse. On completion of the secondary screening procedures, Dr. Gast wrote a report, dated March 10, 1953. Dr. Gast sent Dr. Knuesli his report in order that Dr. Knuesli might synthesize new compounds related to those compounds on which the test results were final.

Dr. Gast performed tertiary tests on selected compounds to obtain information on those compounds' effective dosage rates, soil persistence, and selectivity under field conditions. The selected compounds and existing standard herbicides were tested in fields on small plots. These field plots were located on land at Schweizerhalle and at Geigy-Basle's experimental farm, Pfeffingen. By summer, 1954, Dr. Gast tested the compounds on crops including oats, wheat, peas, carrots, clover, spinach, corn, and potatoes.

Dr. Gast infrequently orally reported the results of his field test. He prepared written reports, although on occasion, the writing of these reports was delayed until yearend. All of Dr. Gast's reports were translated and sent to Dr. Antognini. Dr. Gast never visited Dr. Antognini at the Bayonne laboratory.

Dr. Antognini also performed at Bayonne primary and secondary screening tests and field tests on numerous compounds synthesized by Dr. Knuesli. Dr. Antognini first added the compounds to a solvent for use in application to the test plants. Like Dr. Gast, Dr. Antognini always utilized untreated control plants and a standard known herbicide to assure that results would be noticed. Dr. Antognini recorded his test results in a laboratory notebook and either Dr. Ferguson or

Mr. Alexander countersigned them. The original primary screening test data recorded in the laboratory notebook later was transferred to other sheets of paper. The test results were communicated to Geigy-Basle through Dr. Ferguson or Mr. Alexander. Dr. Antognini never visited Geigy-Basle.

Dr. Antognini utilized different methods and test plants in his primary and secondary screening tests than those used by Dr. Gast. Dr. Antognini utilized four primary screening tests prior to January 1952, including a soil germination test, a watering test, a plant-spraying test, and a petri dish germination test. These four tests can be summarized as follows:

| *Test* | *Factor* | *Ardsley* |
|---|---|---|
| Soil germination | Application method | Water after seeding |
| | Plant species | Cucumbers |
| | | Radish |
| | | Barnyard grass |
| | Replications | 3 |
| | Rating system | Percent germination |
| | | 0 to 10; growth of tops with 10 = same as checks |
| Watering test | Application method | Watered emulsion |
| | Plant species | Cucumbers |
| | | Soybeans |
| | | Barnyard grass |
| | Replications | 3 |
| | Application rate | 6.9 $g/m^2$ |
| | Rating system | 0 to 10; growth of tops |
| | | Also notes on: |
| | | Chlorosis of leaves |
| | | Necrosis of leaves |
| | | Malformation of leaves |
| | | Death |
| | | Defoliation |
| | | Wilting |

| *Test* | *Factor* | *Ardsley* |
|---|---|---|
| | | Proliferation of stems |
| | | Epinasty of stems and petioles |
| | | Strength of stems |
| Plant spraying test | Application method | Emulsion sprayed on 2-week-old plants |
| | Plant species | Cucumbers |
| | | Soybeans |
| | | Barnyard grass |
| | Replications | 3 |
| | Concentration | 1% |
| | Rating system | 0 to 10; growth of tops |
| | | 10 = normal growth |
| | | Also notes on the same list as Watering test above |
| Petri dish germination test | Application method | 5 ccs of a 0.1% solution in petri dish with 25 or 50 seeds |
| | Plant species | Cucumbers |
| | | Radish |
| | | Barnyard grass |
| | Replications | 3 |
| | Rating system | 0 to 10; growth of tops and roots |
| | | 10 = normal growth |
| | | Also notes on: Thickness of stems, chlorotic, burned or malformed leaves, secondary roots, root hairs and color of roots. |

Dr. Antognini wrote a report, dated March 4, 1952, on the results of his primary screening tests.

During 1952, Dr. Antognini performed primary screening tests on more than 100 Geigy-Basle chemical compounds; he wrote six reports on his results. In 1953, Dr. Antognini performed primary screening tests on 187 Geigy-Basle compounds; he wrote six reports on the results of these tests. Additionally, in 1953, Dr. Antognini performed secondary screening tests of numerous Geigy-Basle compounds. His secondary screening test methods can be summarized as follows:

| *Factors* | *Ardsley* |
|---|---|
| Application method | Water emulsion |
| | Water emulsion after 2 weeks |
| Crop species | Lima beans |
| | Soybeans |
| | Corn, sweet |
| | Peas |
| | Cotton |
| | Cucumbers |
| | Radish |
| | Oats |
| Weed species | Wild mustard |
| | Barnyard grass |
| | Red root |
| | Crabgrass |
| | Others |
| Replications | 3 |
| Application rate | 3 lbs/A |
| | 30 lbs/A |
| Time of application | Immediately after seeding |
| | Two weeks after plant emergence |
| Number of seeds | 10 crop seeds |
| | 50 weed seeds |
| Containers | 13″ × 20″ flats |
| Application method | Automatic spray table |

| Factors | Ardsley |
|---|---|
| Information sought | Percent control of weeds<br>Percent kill of crop<br>Effect on growth of crops and<br> weeds - 2 weeks |
| Notes on: | Chlorosis of leaves<br>Necrosis of leaves<br>Death of leaves<br>Defoliation<br>Wilting of plants<br>Proliferation of stems<br>Epinasty of stems and petioles<br>Strength of stems |

Although the screening techniques and field testing techniques of Dr. Gast and Dr. Antognini differed, both men utilized generally available and acceptable testing methods. Both used pre-emergent primary screening techniques which would identify phytotoxicity activity. It was not necessary to have "in-house" biological screening capability. Geigy-Basle could have contracted a private organization, such as Boyce-Thompson or Wisconsin Alumni Research Foundation, to perform screening tests on Geigy-Basle's behalf. Typically, the tests would have been performed under a prearranged fee schedule. The private testing organization generally would not have received any licensing rights.

## 4. Discovery of the Triazine Herbicides

Between 1952 and 1969, approximately 2,000 triazine compounds were synthesized at Geigy-Basle. Dr. Knuesli commenced his synthesis of the first triazine compound, chlorazine, on September 2, 1952. Prior to its synthesis, chlorazine was a known chemical compound but it did not have a known use; it previously had never been examined for herbicidal properties.[19] After Dr. Knuesli synthesized chlorazine, he assigned it code number G25804. He sent samples of the compound to Dr. Gast and Dr. Antognini for screening.

Dr. Gast performed primary screening tests on chlorazine as follows:

---

[19]The structure of chlorazine is a cyanuric derivative without an aryl radical.

| Test | Date commenced | Date completed |
|------|----------------|----------------|
| Phytohormone | 11/26/52 | 12/5/52 |
| Germination | 11/24/52 | 12/23/52 |
| Contact (spray) | 12/15/52 | 12/30/52 |
| Defoliant | 3/18/53 | 4/2/53 |

In these tests, Dr. Gast utilized plant flats; observations were made for 1 month. Dr. Gast observed that all plants given high dosages of chlorazine died after 30 days. Dr. Gast's germination tests showed that chlorazine had extraordinary activity, but he did not observe any phytohormonal or epinastic effects. Dr. Gast recalled telephoning his test results to Dr. Knuesli in late 1952. Dr. Gast wrote a report, dated April 16, 1953, on his primary screening test results; Dr. Gysin sent a copy of this report to Ardsley. Dr. Gast recommended chlorazine for further testing; consequently, after receiving a new supply of synthesized chlorazine from Dr. Knuesli, he commenced his secondary screening and field testing in the summer of 1953. Dr. Gast's secondary screening and field tests demonstrated that chlorazine was selective toward carrots and effective as an herbicide. Dr. Gast informed Dr. Ferguson of his findings during Dr. Ferguson's visit to Geigy-Basle in October 1953. Subsequently, upon his return to Bayonne, Dr. Ferguson informed Dr. Antognini of Dr. Gast's test results.

Dr. Antognini also tested chlorazine. He commenced and completed his primary screening of the compound in January 1953. His soil germination tests showed less toxicity to radishes than to cucumbers and rye grass. His tests revealed herbicidal activity, and in contrast to Dr. Gast's not finding epinastic effects, Dr. Antognini's primary screening of chlorazine showed epinastic effects. Dr. Antognini reported his results in his herbicide-defoliant report on March 16, 1953.

Dr. Antognini also performed secondary screening and field testing of chlorazine. These were conducted in November and December 1953, on a new sample of chlorazine, which had been received from Dr. Knuesli in spring, 1953. Dr. Antognini's tests showed toxicity toward radishes but did not indicate any effects on cotton and corn at application rates as high as 16 pounds per acre. Dr. Antognini's test results were summarized in a written report on February 3, 1954.

Beginning in February 1954, Dr. Knuesli synthesized 20 triazines which were structural variations of chlorazine.[20] Dr. Knuesli's aim was to determine whether the 20 new triazine compounds would produce the herbicidal activity shown by chlorazine and to discern whether and the degree to which small structural variations in chlorazine would improve or be disadvantageous to the exhibition of herbicidal properties. In May 1954, Dr. Knuesli sent samples of these 20 new triazine compounds to Dr. Antognini and Dr. Gast for testing. Among the 20 new triazines were simazine and trietazine. Dr. Knuesli assigned code numbers G27692 and G27901 to simazine and trietazine, respectively. Simazine, like chlorazine, was a known compound when it first was synthesized by Dr. Knuesli in February 1954; however, it had no common name or did it have a known commercial use. Of the 20 sample compounds sent to Drs. Gast and Antognini in May 1954, Dr. Gast eventually proposed 8 for further testing.

The testing of simazine produced hopes that the compound would be a commercially promising herbicide. Drs. Gast and Antognini conducted primary screening tests on simazine in summer, 1954. Dr. Gast's May-1954 pre-emergent germination test showed that simazine killed all test plants. Dr. Gast telephoned these results to Dr. Knuesli in May 1954. Dr. Antognini's primary screening tests indicated herbicidal activity. His test results were sent to Geigy-Basle in a letter dated August 20, 1954. Dr. Antognini recommended in his letter that simazine be tested further as a post-emergent selective herbicide.

Although Dr. Antognini did not perform either secondary screening tests or field tests on simazine, Dr. Gast conducted extensive secondary and tertiary tests because he considered simazine a good candidate for a pre-emergent herbicide compound. Dr. Gast performed these tests at the Schweizerhalle greenhouses and fields in July and August 1954.[21] He observed that simazine persisted in soil for an extended time. Dr.

[20]There are billions of possible triazine compounds and millions of possible chloro-triazine compounds. Not all chemists would have selected those 20 compounds chosen by Dr. Knuesli to synthesize. Some of the 20 compounds included the aryl molecular group, a feature of Dr. Gysin's original plan.

[21]Dr. Gast additionally conducted secondary contact herbicide tests on simazine and other triazines in Summer 1954. He performed watering and spraying tests for sensitivity on vines in August 1954. Simazine and other triazines were tested on garden weeds in June and August 1954.

Knuesli and Dr. Gysin visited Dr. Gast's greenhouses to observe the results of his tests. Dr. Gast reported the test results in a written statement dated December 31, 1954.

Dr. Knuesli synthesized the chemical compound atrazine from an isopropylamino group on July 26, 1955.[22] Prior to atrazine's synthesis by Dr. Knuesli, it was not a known compound. Dr. Knuesli sent atrazine samples to Dr. Gast for testing after assigning the compound code number G30027. On October 11, 1955, Dr. Gast commenced his primary screening test on atrazine. He utilized oats, rye grass, mustard, cucumbers, cotton, vetch, and sugar beets as test plants. Dr. Gast's germination tests showed extreme biological activity—all plants were killed except cotton and corn. Dr. Gast reported these results in December 1955.

In February, March, and June, 1956, Dr. Gast performed secondary screening tests and field tests on atrazine. These tests demonstrated that atrazine would be a useful herbicide leaving less soil residue than simazine. Dr. Gast reported his results on October 19, 1956.

Dr. Knuesli did not send atrazine samples to Ardsley until April 16, 1957. A reason for the delay was that, prior to Dr. Knuesli's synthesis of atrazine, Dr. Antognini terminated his position at Ardsley.

After Dr. Knuesli synthesized atrazine in July 1955, he continued to synthesize new chemical compounds. For example, he subsequently synthesized the bromo-triazine. Dr. Knuesli continued his synthesis work in the search for a chemical compound that was both an herbicide and a defoliant.

### 5. Patents and Governmental Registration of the Pre-Triazine and Triazine Compounds

As a result of the herbicide-defoliant project, several chemical patent applications were filed on pre-triazine chemical compounds. For example, on September 2, 1953, three Swiss patent applications covering the carbamates were filed. On December 14, 1953, a patent application covering the O-phenyl carbamates was filed in the United States. This application

---

[22]Among 29 other triazine compounds that Dr. Knuesli synthesized in Summer 1955, were propazine, ipazine, simetone, and atrazine.

cited numerous examples of the use of the O-phenyl carbamates; all examples resulted from Ardsley's screening of these chemicals. The United States patent on the O-phenyl carbamates was issued on November 5, 1957. On August 23, 1954, two applications for U. S. patents for O-aryl carbamates were filed. These applications cited examples for the use of the O-aryl carbamates, all of which resulted from Ardsley's screening. The U. S. patents were issued on January 1, 1957.

The first triazine patent application was filed in Switzerland on August 16, 1954, to cover the diamino-chloro-s-triazines. The Swiss application included five examples of the compounds' uses—four examples resulted from research conducted at Geigy-Basle and one example was based upon Ardsley's secondary screening of chlorazine. By August 16, 1954, Geigy-Basle had not received the test results from Ardsley on simazine. It is clear from the examples in the Swiss patent application that the geographic source of the example is irrelevant.

On June 14, 1958, the Swiss Government issued a patent covering the diamino-chloro-s-triazines, including chlorazine, simazine, and other compounds. On November 30, 1959, a supplemental application was filed with the Swiss Government to include atrazine and propazine. Of those examples listed in the supplemental Swiss patent application, one was based on Ardsley's secondary screening test of chlorazine. The Swiss supplemental patent was published on January 15, 1960.

On January 12, 1955, a patent application was filed in the United States for diamino-chloro-s-triazines.[23] The patent

---

[23] Use patents on chemical compounds grant to their owners or assignees legal monopolies for one or more specific uses of known named compounds. Composition of matter patents, which are more valuable than use patents, legally protect compounds previously unknown to the scientific world. Some of the triazines synthesized by Dr. Knuesli previously had been synthesized and information on them had been published in scientific literature. Consequently, Geigy-Basle's U.S. patents on the triazines were use patents rather than composition of matter patents.

In 1952, Congress enacted 5 U.S.C. sec. 271 to codify certain aspects of prior judicially created legal doctrines of contributory patent infringement and patent misuse. The former doctrine involved the concept that a patent owner or holder should be entitled to relief against persons or organizations whose acts have facilitated patent infringement by other persons. The latter doctrine involved the concept that a patent owner or holder should be denied relief against infringers where he has attempted illegally to extend the scope of his legal patent monopoly. Congress defined the conduct which constituted contributory infringement in 35 U.S.C. sec. 3271(c), and in 35 U.S.C. sec. 271(d) specified the conduct of a patentee which was not within the scope of the patent misuse doctrine.

In the mid- and late 1950's, chemical companies were not certain whether they would run afoul of the patent misuse doctrine if they tied the sale or licensing of chemical patent rights to the

application included claims that the diamino-chloro-s-triazines were suitable as active ingredients for selective as well as overall toxic weed killers. The claim also stated that the compounds were useful in defoliation and desiccation. Of the 11 examples cited in the patent application, 8 were the result of tests previously performed by Geigy-Basle and 3 were based on Ardsley's secondary screening and field tests on chlorazine. The U.S. patent covering the diamino-chloro-s-triazines was issued on June 23, 1959.

By September 1955, chloro-s-triazine patent applications had been filed in 32 countries, including the United Kingdom, France, Denmark, and Australia. Included in these patent applications were numerous examples, three of which had been taken from Ardsley's secondary screening and field tests.

Other patent applications were made in 1955. For example, on January 14, 1955, a Swiss patent application for alkoxy, alkylmercapto, and other diamino-s-triazines and their methoxy and methylmercapto derivatives was filed. On August 1, 1955, the U.S. patent application for those compounds was filed. That patent application included numerous examples for the best use of those compounds; all examples were based on prior Geigy-Basle tests. The U.S. patent was issued on October 20, 1959.[24]

After a patent application is filed and before a compound is released in a particular market for use as an herbicide, it must obtain governmental label registration. To obtain label registration, the compound must be extensively tested by cooperators in the local fields to assure the compound's effectiveness as an herbicide in the particular climate and soil and to develop dosage rates and performance and safety data. For example, after the chloro-s-triazines were covered by a pending U.S. patent application, they were released for testing to

purchase of non-staples which had essentially no commercial usefulness outside the patented invention. Moreover, during that time, chemical companies holding patents were uncertain whether the doctrine of contributory patent infringement would be applied if they, in agreement with another, refused to license any party requesting rights under their patents. Chemical companies in the 1950s, including Geigy-Basle and Ardsley, considered these uncertainties when they negotiated the terms (including royalty rates) of various licensing arrangements regarding use patents.

In 1980, the Supreme Court resolved these issues in *Dawson Chemical Co. v. Rohm & Haas*, 448 U.S. 176 (1980).

[24]Geigy-Basle's attorneys had listed Dr. Knuesli and Dr. Gysin as the inventors of the claimed compounds on these patent applications.

U.S. cooperators. Simazine was released for testing in 1956, and atrazine was released in 1958. The various triazines were tested by universities, the USDA in Beltsville, the U.S. Department of the Interior, and the U.S. Army. Many of the cooperators included corn as a test plant.[25]

While Geigy-Basle and its licensees were responsible for obtaining European registrations of simazine, Ardsley was responsible for obtaining the U.S. registration labels for simazine and atrazine.[26] Ardsley submitted its and Geigy-Basle's test data on simazine and atrazine to the USDA and the Federal Drug Administration (FDA). The USDA issued a label registration on simazine on April 11, 1957, for use as a 50-percent wettable powder for industrial non-crop use. At that time, the USDA and the FDA rejected simazine for use as an herbicide on corn due to its lengthy soil persistence. In April 1958, simazine was approved as an herbicide for use on corn, and on December 22, 1958, the USDA approved simazine as an 80-percent wettable powder for non-crop use and use as a pre-emergent herbicide for corn. On December 1, 1958, Ardsley received the USDA label registration for atrazine as a 50-percent wettable powder for non-crop use. On January 12, 1959, Ardsley received the USDA label registration for atrazine as an 80-percent wettable powder for crop use. In March or April 1959, the USDA approved atrazine as a 50-percent wettable powder for use as a selective pre-emergent herbicide on corn. The USDA approved atrazine as an 80-percent wettable powder for use as a selective pre-emergent herbicide on corn on September 27, 1960.

### 6. Commercialization of Chemical Compounds Resulting From the Herbicide-Defoliant Project

Between World War II and the time the herbicide-defoliant project was undertaken, significant advances had been made to increase U.S. farm crop production; such development was

---

[25]U.S. cooperators' tests are conducted generally free of charge. However, various expenditures are made in the process of obtaining label registration. Ardsley's estimated expenditures in order to obtain a USDA simazine registration label was approximately $5,000 to $10,000.

[26]Simazine was registered in December 1956 in Switzerland, as a selective herbicide for corn, grapes, and asparagus. Simazine was registered in 1957 in Holland for use on crops, generally. Simazine was registered as a selective herbicide in various other European countries in late 1957 and early 1958.

largely attributable to increased mechanization on farms. Yet, farmers continued to have problems with weed control. The persistent weed problems resulted in farmers' receptiveness to the use of chemical herbicides on their fields. Consequently, more companies became involved in the creation and commercialization of herbicides; many developed a variety of pre-emergent and post-emergent herbicides for use on corn, a significant U.S. crop. These herbicides included, among others, 2,4-D, randox, and eptam; all were effective to some degree but all had disadvantages. For example, 2,4-D was created as a hormonal-type of herbicide to control broadleaf weeds. 2,4-D had the dominant U.S. market position as a post-emergent herbicide for corn, wheat, small grains, and cotton. The active ingredients of 2,4-D sold for approximately 40 cents per pound; the cost of treating one acre of crop with the compound was about 50 cents. The disadvantage of 2,4-D was its tendency to drift and damage nearby crops.

Randox was made by Monsanto Co. as an herbicide for controlling grasses among corn plants. However, it slightly stunted the growth of corn, and it proved difficult to handle because it caused skin and eye irritation.

Eptam was a carbamate compound made by Stauffer Chemical Co. in 1957 through 1958. Its herbicidal use was against annual grasses; it was not effective against broadleaf weeds. Corn was not tolerant to eptam's properties, and farmers found that it had a short soil duration which necessitated frequent reapplication to obtain effective results.

By the late 1950's, the U.S. corn market was the largest in the world. Approximately 83 million acres of corn had been planted, 20 million acres of which had been treated with pre-emergent or post-emergent herbicides. During the early and mid-1950's Geigy-Basle had seen this trend toward increased corn acreage and determined that it should enter the U.S. market by developing and commercializing a good herbicide for use on corn.

In the late 1950's, Geigy-Basle's pesticide management committee, which was authorized to select the particular chemical compounds for future commercialization, decided to release 15 patented triazine compounds for commercialization

as herbicides.[27] Simazine was the first triazine commercialized. Ardsley commenced U.S. simazine sales in 1957. The commercialization of atrazine began thereafter on July 23, 1958. Initially, farmers displayed some purchasing resistance to simazine and atrazine because they were more costly treatments than 2,4-D, randox, and eptam.[28]

## 7. Licensing Agreements

By the time the triazine compounds were ready for commercialization, Geigy-Basle had established a worldwide marketing network of subsidiaries and third-party licensees to distribute its products outside Switzerland. Typically, Geigy-Basle's licensees and subsidiaries would conduct or coordinate all work to commercialize the product, including the testing of the product for governmental label registration and development and promotional work. Geigy-Basle generally restricted its worldwide third-party licensees and subsidiaries to the rights to formulate the compounds' active ingredients and to sell the finished products. Geigy-Basle normally did not grant its licensees or subsidiaries the right to manufacture the compounds' active ingredients.[29] With one exception, eventually all third-party licensing agreements with Geigy-Basle restricted licensees to the formulation and sale of specific triazines; the exception was the 1961 agreement with Nippon Kayaku Co., Ltd., which covered all triazines.

Generally, the formulation and sales licensing agreements between Geigy-Basle and its licensees obligated the licensee to pay Geigy-Basle for the purchase of the compounds' active ingredients plus a royalty, which typically equaled 5 percent of

---

[27]Among the triazines that Geigy-Basle commercialized were simazine, atrazine including terbutylazine, prometryne, ametryne, metroprotryne, terbutryne, desmetryune, dipropetryne, secbumetone, terbumetone, seputhylezine, prometone, and simetryne.

Geigy-Basle holds seven main patent cases covering the commercialized triazines. Geigy-Basle did not commercialize chlorazine, propazine, or atratone in the United States.

[28]The cost of treating one acre of crop with atrazine was approximately $2.50 if the farmer utilized the band method of treating his crops (i.e., the herbicide was applied only to the rows of crops), and $7.50 if the farmer utilized the broadcast method of application (i.e., the entire field was treated with the herbicide).

[29]The most profitable portion of the earnings derived from the sale of the chemical compounds was the part attributable to the manufacture of the compounds' active ingredients. To protect its profit-earning potential, Geigy-Basle did not want to grant its licensees and subsidiaries the right to manufacture the active ingredients for its chemical compounds.

the licensee's net sales.[30] The licensees typically were granted exclusive rights to formulate and to sell the compounds in their assigned territories; however, some of the licensing agreements granted nonexclusive rights to the licensees. For instance, the licensing agreements between Geigy-Basle and Fisons of the United Kingdom, Kwizda of Austria, and Orgachemia of Luxembourg, Belgium, and the Netherlands, granted exclusive formulation and sales rights to the licensees in their specific territories. On the other hand, Societe Le Fly-Tox of France had a nonexclusive licensee in its territory, and Orgachemia had a nonexclusive licensee in Indonesia. Pursuant to the licensing agreements, the licensees generally were required to use the Geigy-Basle trademarks and name in promoting and selling the chemical compounds, including the triazines.

By 1958, a number of companies, including Du Pont, Pennsalt, American Cyanamid, and American Chemical Paint Co. (AmChem) had approached Geigy-Basle to request a license to make and to distribute the triazines in the United States. AmChem would have been willing to pay a royalty of 10 to 15 percent of net sales; Du Pont would have been willing to pay a royalty of 10 to 12.5 percent of net sales. In 1958, Geigy-Basle informed potential licensees other than Ardsley that it did not intend to grant them a triazine license.

On April 29, 1958, Mr. R.T. Parker of Ardsley wrote a letter to Ardsley's attorney informing him that the USDA and the FDA granted the label registration for simazine for use on corn. Mr. Parker discussed the anticipated agricultural market for the use of simazine on corn and other crops. The letter closed with a request to Ardsley's attorney to conclude a simazine licensing arrangement with Geigy-Basle.

On May 26, 1958, Ardsley's board of directors met and resolved to sign a previously negotiated licensing agreement with Geigy-Basle which gave Ardsley the right to distribute simazine in return for royalty payments of 10 percent of net sales. The licensing agreement, entitled "Simazine Compositions and Methods License and Licensing Rights" (simazine license), dated May 1, 1958, was then signed by Mr. Zschokke

---

[30]Occasionally there was a clause that escalated or decreased the royalty rate. For example, Societe Le Fly-Tox agreed to a reduction of 1 percent after 2 years of sales on all tonnage sold above an amount to be then negotiated.

Leupold for Geigy-Basle and Mr. Charles A. Suter, vice president, for Ardsley.

The simazine license between Ardsley and Geigy-Basle granted Ardsley a nonexclusive license "to make or have made for it and to sell in the United States licensed compositions." The May 1, 1958, "Simazine Compositions and Methods Licenses and Licensing Rights" agreement provided in relevant part:

1. The terms defined in this Section shall, for all purposes of this Agreement, have the meanings in this Section specified.

(a) The term "Licensed Patent Claims" shall mean (i) the inventions claimed in United States Patent Application Serial No. 481,474, filed January 12, 1955, (ii) the claim or claims of said application or continuations or divisions thereof (excluding claims which shall have been finally rejected) and the claim or claims of United States patents that shall issue upon said application or continuations or divisions thereof, and of any reissues of said patents, and (iii) all United States patents owned or acquired by Licensor during the term of this Agreement to the extent and only to the extent that the claims thereof cover inventions falling within the scope of one or more of the claims included within the foregoing clauses (i) and (ii); all to the extent that, and subject to the conditions under which, Licensor now has or hereafter shall have the right to grant licenses, immunities or other rights thereunder.

\* \* \* \* \* \* \*

2. Subject to the terms and conditions of this Agreement, Licensor hereby grants to Licensee a non-exclusive, non-transferable license under the Licensed Patent Claims to make or have made for it and to sell in the United States Licensed Compositions. Said license shall extend to and authorize the use in the United States of Licensed Compositions so sold in the practice of the Licensed Methods by the purchaser or successive purchasers of such Compositions.

The license herein granted may be extended by Licensee to its subsidiaries, provided that each such subsidiary to which said license shall be so extended shall become bound by the terms and provisions of this Agreement to the same extent as if it were named herein as "Licensee". Licensee will itself pay and account to Licensor for royalties hereunder in respect of sales of Licensed Compositions by any such subsidiary and, for such purpose, sales of a Licensed Composition by any subsidiary (other than sales by such subsidiary to Licensee) shall be deemed to be sales by Licensee.

3. Licensee hereby grants to Licensor a royalty-free, non-exclusive, non-transferable license under all patents and patent applications of all countries owned or acquired by Licensee during the term of this Agreement to the extent and only to the extent that the claims thereof cover inventions falling within the scope of one or more of the Licensed Patent Claims. Said license may be extended by Licensor to any one or more of its subsidiaries,

other than subsidiaries of Licensee, or to any one or more of its licensees, provided that said license shall not, without the consent of Licensee, be so extended to any person, firm or corporation who shall not grant back for the benefit of Licensee hereunder a royalty-free, non-exclusive, non-transferable license under United States patents and patent applications owned or acquired by it during the term of this Agreement (or during so much of said term as said extension shall be in effect), for the same term as the license so extended, to the extent and only to the extent that the claims thereof cover inventions falling within the scope of one or more of the Licensed Patent Claims.

4. Subject to the terms and conditions of this Agreement, Licensor hereby grants to Licensee a non-exclusive right to grant, either directly or through others, non-exclusive licenses under the Licensed Patent Claims to make or have made for the licensees thereunder and to sell in the United States Licensed Compositions. Each such license so granted shall extend to and authorize the use in the United States of Licensed Compositions sold by the licensee thereunder in the practice of the Licensed Methods by the purchaser or successive purchasers of such Compositions.

5. Licenses granted by Licensee under Section 4 hereof shall be at a royalty rate not less than that provided herein in respect of the manufacture and sale by Licensee of Licensed Compositions and otherwise, in so far as appropriate, on terms substantially the same as the applicable terms of this Agreement, subject to such eliminations, variations and modifications as Licensee shall deem essential and as shall be approved by or for Licensor.

6. Each license granted by Licensee under the Licensed Patent Claims shall include a grant by the licensee of a royalty-free, non-exclusive, non-transferable license under such licensee's Improvement Patents (as hereinafter defined) for the full terms thereof inuring to the benefit of Licensor and each of its subsidiaries, provided that such cross-grant may be in respect of only the United States and may be otherwise reciprocal with grants made by Licensee to such licensee. The term "licensee's Improvement Patents" shall mean all patents and patent applications of all countries owned, acquired or controlled by such licensee during the term of the applicable license agreement, to the extent and only to the extent that the claims thereof cover inventions falling within the scope of one or more of the Licensed Patent Claims; all to the extent that, and subject to the conditions under which, such licensee shall have or may acquire the right to grant licenses, immunities or other rights thereunder.

7. (a) Licensee will pay to Licensor, in respect of Licensed Compositions sold by Licensee, a royalty at the rate of ten per cent of the net sales price (i.e., gross sales price, less discounts, returns, allowances and cost of containers included in gross sales price), f.o.b. Licensee's plant (or, if manufactured in and sold from the plant of another, f.o.b. such other plant), or all such Licensed Compositions so sold.

(b) Licensee will pay to Licensor, in respect of such Licensed Compositions sold by licensees of Licensee, an amount equal to ninety per cent of the royalties collected by Licensee or its licensing agent in respect of such sales. Licensee shall bear all expenses incurred by it in carrying out this

Agreement, the granting of licenses hereunder and the collection of royalties under such licenses.

On November 5, 1958, Ardsley's board of directors met and resolved to accept a drafted supplemental agreement to the May 1, 1958, simazine license. This supplemental agreement expanded some of the definitions of the former agreement including the definition of "licensed compositions." Otherwise, the supplemental agreement left the simazine agreement intact.

During the November 5, 1958, board of directors special meeting, Ardsley's board of directors expressed an interest in obtaining an atrazine license from Geigy-Basle. The board of directors tentatively agreed upon a royalty payment of 10 percent of net atrazine sales if Geigy-Basle would agree to grant an atrazine license. They also discussed Ardsley's need to obtain the capability to manufacture cyanuric chloride, an active ingredient of the triazines. It was suggested that Ardsley could manufacture some of the required cyanuric chloride at its McIntosh plant with the balance to be purchased from Geigy-Basle.

Simazine consists of cyanuric chloride and ethyl amino. Cyanuric chloride is manufactured from hydrocyanic acid. In 1957, Nilok Chemicals, Inc., sold cyanuric chloride in the United States for 75 cents per pound; Degussa, a European company, sold it for 56 cents per pound. By comparison, it was estimated that after obtaining the right to manufacture cyanuric chloride, Ardsley could manufacture it for 26.20 cents per pound. In 1958, Ardsley and Nilok Chemicals, Inc., negotiated an option to allow Ardsley to purchase a right to its manufacturing process for cyanuric chloride. Ardsley continued to investigate alternatives to the Nilok Chemicals, Inc., manufacturing process; it considered the manufacturing processes of Farwell Chemical Co. and Musashino Co. On April 29, 1959, Geigy-Basle signed a licensing agreement with Musashino Co. Musashino Co. granted Geigy-Basle the right to use its cyanuric chloride manufacturing process in the United States and specifically to make Ardsley the sub-licensee; the license prohibited Geigy-Basle from granting such rights to other licensees.

In 1959, Ardsley commenced construction of a cyanuric chloride manufacturing unit at its McIntosh plant. The first

unit was built at a cost of $943,136, and began functioning during fall, 1960. Subsequently, between 1959 and 1968, Ardsley constructed a total of six cyanuric chloride manufacturing units at a cost in excess of $14 million.[31]

By agreement (Musashino process license) executed by Geigy-Basle and Ardsley, dated May 1, 1960, Geigy-Basle subleased to Ardsley the Musashino manufacturing process rights and the Degussa know-how regarding cyanuric chloride. The Musashino process license granted to Ardsley a nonexclusive license to use the Musashino process in manufacturing and selling cyanuric chloride in the United States. Ardsley promised to pay Geigy-Basle a royalty, as follows: (1) Two cents per pound for the first 5 million pounds of cyanuric chloride manufactured, plus (2) 1½ cents per pound for all amounts of cyanuric chloride manufactured in excess of 5 million pounds up to 8,666,667 pounds or until 5 years after Ardsley first manufactured cyanuric chloride, plus (3) 1¼ cents per pound for amounts sold or used by third parties which were not Geigy-Basle's subsidiaries. If the 5-year clause were triggered, Ardsley would be responsible for paying not less than $100,000 to Geigy-Basle. Geigy-Basle promised to engage in research and development and to make available to Ardsley all data, information, and technical know-how.

In December 1959, petitioner's board of directors authorized licenses for the triazine herbicides atratone and prometone on terms similar to the earlier simazine and atrazine agreements.

On January 1, 1961, a replacement triazine licensing agreement (replacement triazine license) was executed by Ardsley and Geigy-Basle covering U.S. patent number 2,891,855, which was issued on June 23, 1959. In pertinent part, the January 1, 1961, replacement triazine licensing agreement executed by Ardsley and Geigy-Basle included the following provisions:

1. The terms defined in this Section 1 shall, for all purposes of this Agreement, have the meanings in this Section 1 specified.

(a) The term "Licensed Patents" shall mean (i) United States Patent No. 2,891,855, issued June 23, 1959, and any reissues thereof, (ii) all United States patents and patent applications, and transferable interests therein or rights with respect thereto, owned or acquired by Licensor during the term of this Agreement, to the extent and only to the extent that the claims

---

[31]Prior to 1959, Ardsley obtained its simazine supply exclusively from Geigy-Basle. In 1959, Ardsley obtained a portion of its simazine from its Cranston, Rhode Island, facility.

thereof cover inventions falling within the scope of one or more of the claims of said Patent No. 2,891,855, and (iii) all United States patents and patent applications, and transferable interests therein or rights with respect thereto, owned or acquired by Licensor during the term of this Agreement, to the extent and only to the extent that the claims thereof cover inventions useful in connection with the manufacture of Licensed Products (hereinafter defined), including preparation or manufacture of raw materials, intermediates for or components of Licensed Products; all to the extent that, and subject to the conditions under which, Licensor now has or hereafter shall have the right to grant licenses, immunities or other rights thereunder.

$$* \quad * \quad * \quad * \quad * \quad * \quad *$$

(c) The term "Licensed Products" shall mean (i) compounds, compositions and products covered by one or more of the claims of the patents referred to in clauses (i) and (ii) of paragraph (a) of this Section 1, and (ii) any essential active ingredient of any of such compositions or products if and to the extent that, within the meaning of 35 U.S.C. 271(c), such ingredient constitutes a material part of the invention covered by one or more of the claims of said patents and is sold for use as a component of any such composition or product, or for use in practicing a process, so covered, but only so long as said active ingredient shall not be a staple article or commodity of commerce suitable for substantial non-infringing use.

$$* \quad * \quad * \quad * \quad * \quad * \quad *$$

2. Subject to the terms and conditions of this Agreement, Licensor hereby grants to Licensee an exclusive, nontransferable license under the Licensed Patents to make or have made for it and to sell in the United States Licensed Products. Said license shall extend to and authorize the use in the United States of Licensed Products so sold in the practice of the Licensed Methods by the purchaser or successive purchasers of such Products.

The license herein granted may be extended by Licensee to its subsidiaries, provided that each such subsidiary to which said license shall be so extended shall become bound by the terms and provisions of this Agreement to the same extent as if it were named herein as "Licensee". Licensee will itself pay and account to Licensor for royalties hereunder in respect of sales of Licensed Products by any such subsidiary and, for such purpose, sales of a Licensed Product by any subsidiary (other than sales by such subsidiary to Licensee) shall be deemed to be sales by Licensee.

3. Licensee hereby grants to Licensor a royalty-free, non-exclusive, nontransferable license under its Improvement Patents for all countries other than the United States to make or have made and to sell Licensed Products in such countries. Said license may be extended by Licensor to any of its subsidiaries or licensees, provided that said license shall not, without the consent of Licensee, be so extended to any person, firm or corporation that shall not grant back for the benefit of Licensee and each of its subsidiaries and licensees a royalty-free, non-exclusive, nontransferable license under its Improvement Patents for the United States of at least the same scope and term as the license so extended.

4. Subject to the terms and conditions of this Agreement, Licensor hereby grants to Licensee an exclusive right to grant, either directly or through others, non-exclusive licenses under the Licensed Patents to make or have made for the licensees thereunder and to sell in the United States Licensed Products. Each such license so granted shall extend to and authorize the use in the United States of Licensed Products sold by the licensee thereunder in the practice of the Licensed Methods by the purchaser or successive purchasers of such Products.

5. Licenses granted by Licensee under Section 4 hereof shall be at a royalty rate not less than that provided herein in respect of the manufacture and sale by Licensee of Licensed Products and otherwise, in so far as appropriate, on terms substantially the same as the applicable terms of this Agreement, subject to such eliminations, variations and modifications (other than in regard to royalty rate) as Licensee shall deem essential.

\* \* \* \* \* \* \* .

7. (a) Licensee will pay to Licensor, in respect of Licensed Products sold by Licensee, a royalty at the rate of ten percent of the net sales price (i.e., gross sales price, less discounts, returns and allowances), f.o.b. Licensee's plant (or, if manufactured in and sold from the plant of another, f.o.b. such other plant), of all such Licensed Products so sold.

(b) Licensee will pay to Licensor, in respect of Licensed Products sold by licensees of Licensee, an amount equal to ninety percent of the royalties collected by Licensee or its licensing agent in respect of such sales. Licensee shall bear all expenses incurred by it in carrying out this Agreement, the granting of licenses hereunder and the collection of royalties under such licenses.

On January 1, 1962, petitioner and Geigy-Basle entered into a consolidated replacement agreement for atratone and prometone on terms similar to the earlier replacement triazine license.

### 8. Sales Forecasts and Actual Sales of Simazine and Atrazine

As of February 15, 1957, the managements of Geigy-Basle and Ardsley considered simazine's commercial prospects to be promising. Mr. Parker, of Ardsley, estimated in April 1958, that sales of simazine for use solely as a corn herbicide could be "several million pounds" and within a few years could reach 10 to 15 million pounds. In September 1958, Mr. D. Burckhardt, head of Ardsley's commercial department, anticipated that the sales of simazine and atrazine by 1962 would reach $2 million and $4 million, respectively. At prices of

approximately $4 to $4.50 per pound,[32] Dr. Burckhardt forecast the triazine sales between 1958 and 1962 would be as follows:

|  | 1958 | 1959 | 1960 | 1961 | 1962 |
|---|---|---|---|---|---|
| Simazine | $1,000,000 | $2,000,000 | $2,000,000 | $2,000,000 | $2,000,000 |
| Atrazine | - - - | 300,000 | 1,000,000 | 3,000,000 | 4,000,000 |
| Other triazines | - - - | 100,000 | 500,000 | 1,300,000 | 2,500,000 |

Ardsley's actual sales experience differed from the forecasts. In 1958, simazine sales were low as a result of abnormally low rainfall in the midwest. From 1958 through 1969, Ardsley's actual sales of simazine were as follows:

---

[32]When simazine and atrazine were first introduced into the U.S. commercial market, the selling price of the formulated products was approximately $4 to $4.50 per pound of the equivalent active ingredient. The sales price of the herbicides gradually was reduced to approximately $2.50 per pound. Between 1958 and 1959, Ardsley's average annual selling prices of simazine and atrazine (on the basis of per pound of active ingredient) were as follows:

| Year | Price |
|---|---|
| 1959 | NA[1] |
| 1960 | $3.49 |
| 1961 | 2.94 |
| 1962 | 2.63 |
| 1963 | 2.60 |
| 1964 | 2.56 |
| 1965 | 2.56 |
| 1966 | 2.56 |
| 1967 | 2.56 |
| 1968 | 2.56 |
| 1969 | 2.56 |

[1]Price in 1959 not lower than price in 1960.

The manufacturing costs of simazine and atrazine totaled approximately 50 cents per pound. Between 1962 and 1965, Ardsley's actual manufacturing costs of simazine and atrazine (based on per pound of active ingredient) were as follows:

| Year | Simazine cost (cents/lb.) | Atrazine cost (cents/lb.) |
|---|---|---|
| 1961 | - - - | 55.72 |
| 1962 | 53.83[1] | 51.51 |
| 1963 | 54.35 | 50.89 |
| 1964 | 49.26 | 47.56 |
| 1965 | 41.83 | 39.81 |
| 1966 | 40.43 | 35.69 |
| 1967 | 35.47 | 33.68 |
| 1968 | 35.88 | 33.37 |
| 1969 | 35.89 | 30.80 |

[1]Cost of 96 percent technical material.

| Year | $000 | Weight in pounds |
|------|------|------------------|
| 1958 | $943 | |
| 1959 | 2,070 | 940,909 |
| 1960 | 1,447 | 450,444 |
| 1961 | 1,576 | 563,228 |
| 1962 | 1,995 | 732,679 |
| 1963 | 2,082 | 790,199 |
| 1964 | 2,828 | 1,156,693 |
| 1965 | 3,094 | 1,170,395 |
| 1966 | 4,160 | 1,574,884 |
| 1967 | 5,025 | 1,917,773 |
| 1968 | 5,903 | 2,254,525 |
| 1969 | 7,245 | 2,745,684 |

Atrazine proved to be a very valuable corn herbicide. It was effective as a pre-emergent and post-emergent herbicide. In contrast to simazine, atrazine did not persist in the soil for an extended time; it generally degraded by the end of corn's growing season. Atrazine was more water soluble than simazine and therefore needed less rainfall to be effective.[33] Additionally, atrazine lengthened the growing season of corn which subsequently led to an increase in corn's crop yield.

These positive features of atrazine resulted in high U. S. sales. For the period 1959[34] through 1969, Ardsley's actual sales volume in dollars and weight in pounds were as follows:

| Year | $000 | Weight in pounds |
|------|------|------------------|
| 1959 | $84 | 15,890 |
| 1960 | 2,711 | 788,598 |
| 1961 | 7,339 | 2,498,580 |
| 1962 | 13,194 | 5,028,745 |
| 1963 | 17,294 | 6,651,120 |
| 1964 | 26,001 | 9,931,785 |
| 1965 | 35,420 | 14,099,476 |
| 1966 | 53,177 | 21,333,263 |
| 1967 | 85,309 | 34,907,259 |
| 1968 | 121,905 | 47,849,060 |
| 1969 | 165,506 | 64,465,600 |

---

[33]Simazine had high solubility requirements for a full effectiveness as an herbicide. Low rainfall resulted in less absorption of simazine; thus it was less effective in draught or low rainfall conditions.

[34]In 1959, Ardsley obtained its atrazine supply from Geigy-Basle.

Between 1958 and 1969, Ardsley realized gross profits on the sales of simazine and atrazine as follows:

| Year | Simazine $000 | Atrazine $000 |
|------|------|------|
| 1958 | $407 | |
| 1959 | 1,029 | $34 |
| 1960 | 564 | 786 |
| 1961 | 504 | 4,330 |
| 1962 | 818 | 8,972 |
| 1963 | 1,478 | 12,625 |
| 1964 | 2,093 | 19,761 |
| 1965 | 2,413 | 27,982 |
| 1966 | 3,216 | 43,605 |
| 1967 | 3,713 | 67,565 |
| 1968 | 4,642 | 99,339 |
| 1969 | 5,632 | 137,628 |

These earned gross profits resulted in estimated net profits before royalties, as follows:

| Year | Simazine $000 | Atrazine $000 |
|------|------|------|
| 1958 | $22 | |
| 1959 | 286 | $4 |
| 1960 | (35) | (337) |
| 1961 | (13) | 1,921 |
| 1962 | 222 | 5,030 |
| 1963 | 881 | 7,667 |
| 1964 | 1,096 | 10,596 |
| 1965 | 1,356 | 15,879 |
| 1966 | 1,992 | 27,955 |
| 1967 | 2,521 | 47,150 |
| 1968 | 3,222 | 70,009 |
| 1969 | 3,382 | 86,222 |

As required by the licensing agreements between Ardsley and Geigy-Basle, between 1958 and 1969 Ardsley paid royalties to Geigy-Basle based on net sales of simazine and atrazine, as follows:

| Year | Simazine royalties in $000 | Atrazine royalties in $000 |
|------|------|------|
| 1958 | $8 | |
| 1959 | 205 | $8 |
| 1960 | 145 | 271 |
| 1961 | 155 | 720 |

| Year | Simazine royalties in $000 | Atrazine royalties in $000 |
|------|------|------|
| 1962 | $196 | $1,296 |
| 1963 | 205 | 1,705 |
| 1964 | 279 | 2,563 |
| 1965 | 304 | 3,486 |
| 1966 | 412 | 5,263 |
| 1967 | 498 | 8,460 |
| 1968 | 582 | 12,029 |
| 1969 | 714 | 16,309 |

Simazine and atrazine were also commercially successful outside the United States. By 1959, the combined sales of simazine and atrazine reached almost 1 million pounds. By 1961, the combined sales of simazine and atrazine in Switzerland had doubled to 2.1 million pounds.[35]

As a result of licensing agreements between Geigy-Basle and its licensees and subsidiaries located outside of the United States, Geigy-Basle received royalties from the combined sales of simazine and atrazine, as follows:

| Year | Swiss Franc (SwF) × 1,000 |
|------|------|
| 1959 | 186 |
| 1960 | 388 |
| 1961 | 912 |
| 1962 | 990 |
| 1963 | 1,408 |
| 1964 | 1,625 |
| 1965 | 1,973 |
| 1966 | 2,248 |
| 1967 | 2,398 |
| 1968 | 2,208 |
| 1969 | 2,633 |

Geigy-Basle realized gross profits on the worldwide (including the U.S.) sales of simazine and atrazine, as follows:

| Year | Simazine SwF × 1,000 | Atrazine SwF × 1,000 |
|------|------|------|
| 1959 | 8,060 | 4,676 |
| 1960 | 8,646 | 4,873 |
| 1961 | 8,841 | 5,919 |
| 1962 | 11,525 | 7,809 |

[35]Simazine and atrazine were important for general weed control in England, South Africa, Canada, and other countries.

| Year | Simazine<br>SwF × 1,000 | Atrazine<br>SwF × 1,000 |
|------|-------------------------|-------------------------|
| 1963 | 8,652 | 10,795 |
| 1964 | 9,069 | 12,894 |
| 1965 | 8,822 | 12,937 |
| 1966 | 11,963 | 21,853 |
| 1967 | 11,322 | 26,759 |
| 1968 | 13,366 | 35,571 |
| 1969 | 16,714 | 57,829 |

### 9. Other Licensing Agreements Executed in the Agricultural-Chemical Field in the 1950's and early 1960's

On October 21, 1959, Geigy-Basle and Norddeutsche Affinerie (NR) entered into a contract granting NR the non-exclusive right to import, to formulate, and to sell and/or use simazine and atrazine in Germany under Geigy-Basle's trademark. Geigy-Basle promised to furnish NR full technical support and advice for the formulation, packaging, and use of the products. NR agreed to pay a royalty of 5 percent of the net sales value of the products sold. NR promised to purchase the simazine and atrazine needed for its formulations exclusively from Geigy-Basle and agreed not to resell these purchases to third parties. The contract term applied retroactively to July 1, 1957, and expired June 30, 1967.

On June 21, 1960, Geigy-Basle and Orgachemia of Holland (Orgachemia) entered into an agreement giving Orgachemia the exclusive right to formulate, package, and distribute simazine, atrazine, and propazine in the Netherlands, Belgium, and Luxembourg, and the nonexclusive right to formulate, package, and distribute those herbicides in Indonesia. Orgachemia promised to acquire the active ingredients required in its formulation exclusively from Geigy-Basle and to refrain from producing and distributing competing weed control agents. Orgachemia additionally agreed to inform Geigy-Basle of its experience with the licensed herbicides. Geigy-Basle agreed to furnish Orgachemia technical support for the formulation, packaging, and use of the simazine, atrazine, and propazine products. Orgachemia promised to pay a royalty of 5 percent of the net invoice value of the products sold without exemption for products obtained directly from Geigy-Basle and resold intact. This agreement applied retroac-

tively to October 1, 1959, and terminated on September 30, 1967.

In 1959, Geigy-Basle and VEB Farbenfabrik Wolfen (Wolfen), an East German company, entered into an agreement granting Wolfen the exclusive right to manufacture, formulate, and sell simazine in East Germany. Wolfen agreed to pay Geigy-Basle a royalty of 6 percent of net sales. In 1962, the parties entered into a similar agreement with respect to atrazine.

On its Federal income tax returns for taxable years 1965 through 1969, petitioner claimed deductions for royalties paid to Geigy-Basle under licensing agreements covering agricultural chemical products, as follows:

| Taxable year | Amount |
|---|---|
| 1965 | $7,391,309.23 |
| 1966 | 9,693,553.42 |
| 1967 | 16,469,576.43 |
| 1968 | 21,899,005.90 |
| 1969 | 25,310,686.00 |

Respondent disallowed a portion of the royalties relating to licensing agreements covering other agricultural chemical products, as follows:

| Taxable year | Amount |
|---|---|
| 1965 | $2,075,143 |
| 1966 | 2,900,846 |
| 1967 | 4,385,237 |
| 1968 | 5,897,710 |
| 1969 | 7,949,341 |

In his statutory notice of deficiency respondent explained the disallowed amounts:

For each of the years covered by this notice you engaged in transactions under licensing agreement with J. R. Geigy S. A. covering agricultural chemical products which were not at arm's length. Under the authority of section 482 of the 1954 Code royalty expenses are allocated to the extent shown. It is determined that this allocation is necessary to prevent the evasion of taxes and to clearly reflect income.

Additionally, respondent stated that the disallowed amounts constituted constructive dividends paid by petitioner to Geigy-Basle and were subject to a 5-percent withholding tax.

OPINION

For completeness, we have made exhaustive findings of facts based upon a lengthy and often engrossing trial, in which both parties made comprehensive evidentiary presentations of all matters which they deemed relevant to a determination of the relatively straightforward issue to be decided, namely, the appropriate rate of royalty, if any, to be paid by petitioner to its Swiss parent under certain licensing agreements. Despite this avalanche of data, and the inevitable very lengthy briefs which followed, we think the essential facts may be briefly but adequately summarized as we have done in the opinion which follows.

Petitioner, a New York corporation, is a wholly owned subsidiary of Ciba-Geigy, Ltd. (Geigy-Basle), a Swiss corporation. Geigy-Basle was founded in Basle, Switzerland, in 1758 as a trading company specializing in imported dyestuffs. By the early 1940's, Geigy-Basle was successfully engaged in the research and development of industrial chemicals, pharmaceuticals, and pesticides.

Geigy-Basle organized petitioner in 1909 to market and sell its products in the United States. By 1951, petitioner was engaged in the formulation and sale of agricultural chemical products and pharmaceutical products.

In 1951, pursuant to the recommendation of Dr. George Ferguson, the technical director of petitioner's insecticide department, Geigy-Basle initiated a research project to develop new defoliants and herbicides. Using a plan formulated by Dr. Hans Gysin (Dr. Gysin), the Geigy-Basle research chemist in charge of the herbicide-defoliant project, Dr. Enrico Knuesli (Dr. Knuesli), a chemist for Geigy-Basle, synthesized various chemical compounds including certain triazine compounds. These compounds were subsequently screened for herbicidal activity by Dr. Albert Gast (Dr. Gast) at the Geigy-Basle laboratory in Basle, Switzerland, and by Dr. Joe Antognini (Dr. Antognini) at petitioner's laboratory in Bayonne, New Jersey.

From 1952 through 1955, Drs. Gast and Antognini screened hundreds of triazine compounds synthesized by Dr. Knuesli. The test results of both scientists identified certain triazine compounds, including simazine and atrazine, as commercially promising herbicides. Geigy-Basle eventually filed patent ap-

plications for the triazine herbicides in more than 32 countries, including the United States.

Prior to obtaining a U.S. patent for the triazine herbicides, Geigy-Basle was required to obtain governmental label registration for any compound it intended to market in the United States as a herbicide. Petitioner agreed to perform the work necessary to obtain the U.S. registration labels for the triazine herbicides. On June 23, 1959, a U.S. patent covering the triazine herbicides was issued to Geigy-Basle.

During the late 1950's, Geigy-Basle selected 15 patented triazine compounds, including simazine, atrazine, atratone, and prometone, for commercialization as herbicides. By agreement dated May 1, 1958, Geigy-Basle granted petitioner a nonexclusive license to manufacture and sell simazine in the United States. In return, petitioner agreed to pay Geigy-Basle a royalty equal to 10 percent of net sales. In November 1958, petitioner and Geigy-Basle entered into a similar agreement with respect to atrazine.

The simazine license further provided that:

(1) Ardsley granted a reciprocal royalty-free license to Geigy-Basle of Ardsley's improvements on the diaminochloros-triazine patent;

(2) Ardsley had the right to extend the simazine license to subsidiaries, which would be bound by the terms of the simazine license, but Ardsley would continue to be responsible directly to Geigy-Basle for paying royalties from its own and its subsidiaries' sales of the licensed compositions;

(3) Ardsley granted Geigy-Basle a royalty-free, nonexclusive, nontransferable license to cover inventions under existing and later-acquired patents and patent applications in all countries which Ardsley owned or acquired during the term of the simazine license;

(4) Geigy-Basle had the right to extend the royalty-free, nonexclusive, nontransferable license covering inventions to its subsidiaries and licensees as long as the subsidiaries and licensees granted back to Ardsley a royalty-free, nonexclusive license covering their inventions;

(5) Geigy-Basle granted Ardsley a right to grant nonexclusive licenses under existing patent claims; the stipulated royalty rate was to equal not less than the amount Ardsley

was obligated to pay with regard to the manufacture and sale of the licensed composition;

(6) Geigy-Basle would be entitled to a cross-grant on any improvement patents under which Ardsley licensed its licensees;

(7) Ardsley would pay Geigy-Basle a royalty of 10 percent of the net sales price (gross sales price minus discounts, returns, allowances, and costs of containers) on any licensed composition sold by Ardsley;

(8) Ardsley would pay Geigy-Basle 90 percent of royalties collected from Ardsley's sub-licensees for sales of the licensed compositions; and

(9) Geigy-Basle would make available to Ardsley all laboratory, technical, and manufacturing data regarding the licensed compositions, and Ardsley would make available to Geigy-Basle all laboratory, technical, and manufacturing data regarding the licensed compositions.

By agreement dated November 1, 1959, Geigy-Basle granted petitioner a nonexclusive license to manufacture and sell atratone and prometone in the United States. In return, petitioner agreed to pay Geigy-Basle a royalty equal to 10 percent of net sales.

By agreement dated January 1, 1961, petitioner and Geigy-Basle entered into a consolidated license agreement granting petitioner an exclusive license to manufacture and sell simazine and atrazine in the United States. Petitioner and Geigy-Basle entered into a similar agreement on January 1, 1962, granting petitioner an exclusive license to manufacture and sell atratone and prometone in the United States. Both agreements superseded the individual license agreements previously executed, and provided for a royalty of 10 percent.

These replacement triazine licenses provided in pertinent part that—(1) the license was an exclusive license allowing Ardsley "to make or have made for it and to sell in the United States Licensed Products"; (2) Ardsley was granted permission to extend the license to its subsidiaries and to successive purchasers of the licensed products; (3) Ardsley granted to Geigy-Basle a royalty-free, nonexclusive license on improvements on the U.S. patent; Geigy-Basle was permitted to extend the nonexclusive license to its subsidiaries or licensees provided that in return they were willing to extend to Ardsley a

license on their improvement patents; (4) Geigy-Basle granted to Ardsley an exclusive right to grant, directly or through others, nonexclusive licenses covering the "licensed products" to make or to have them made for licensees and to sell them in the U.S.; this grant required a royalty payment at a rate of not less than provided otherwise by the replacement triazine license; (5) Ardsley promised to pay a royalty to Geigy-Basle at a rate of 10 percent of the net sales price (gross sales price minus discounts, returns, and allowances) of the "licensed products" sold; (6) Ardsley additionally agreed to pay 90 percent of that royalty amount if sub-licensees were involved; (7) Ardsley and Geigy-Basle promised to make available to one another all laboratory, technical, and manufacturing data without cost; (8) Geigy-Basle gave Ardsley the right to bring any patent infringement action at the latter's own expense.

From 1958 to 1969, petitioner paid royalties of $55,813,000 to Geigy-Basle based on net sales of simazine and atrazine in the United States. During this period, petitioner earned net profits after royalties of $231,215,000 from the sale of simazine and atrazine in the United States.

Respondent makes two arguments in this case. The first, his "principal argument," is that in 1951 Basle and Ardsley entered into a joint and cooperative research and development effort under which it would have been reasonable and logical for the two companies to share equally the fruits of their research by providing for a geographical division of the market, thus requiring a royalty-free license. This issue, and the resultant increases in deficiency and withholding liability, was raised for the first time in respondent's amendment to answer. The statutory notice of deficiency simply reduced the royalty payable from 10 percent to 6 percent under the 1961 and 1962 licenses. Respondent concedes that he has the burden of proof on the increased deficiencies and withholding liabilities. See Rule 142(a).

Respondent's alternative argument, which is the issue raised by the notice of deficiency, is that under the criteria contained in section 1.482–2(d)(2), Income Tax Regs., a rate of royalty in an amount less than the 10 percent claimed by petitioner would have been arrived at in arm's-length negotiations between unrelated parties.

Petitioner argues that an unrelated party would have paid a royalty of 15 percent for similar rights under the triazine patents. Petitioner therefore concludes that it is entitled to apply the difference between a royalty of 15 percent and a royalty of 10 percent as a setoff against other section 482 allocations which have been settled by the parties.

After careful consideration of the record before us, we are convinced that a royalty of 10 percent constituted an arm's-length consideration for the exclusive right to manufacture and sell the triazine herbicides in the United States. We also conclude that petitioner is not entitled to an additional setoff for royalties in excess of 10 percent.

Section 482[36] empowers respondent to allocate gross income, deductions, credits, or allowances between commonly controlled organizations if he determines that such allocation is necessary to prevent evasion of taxes or to clearly reflect the income of such organizations. The purpose of section 482 is to place a controlled taxpayer on 'a parity with uncontrolled, unrelated taxpayers. *Huber Homes, Inc. v. Commissioner*, 55 T.C. 598, 605 (1971); sec. 1.482–1(b)(1), Income Tax Regs. The critical inquiry is whether the transaction in question would have been similarly effected by unrelated parties dealing at arm's length. Sec. 1.482–1(b)(1), Income Tax Regs.

Respondent has considerable discretion in applying section 482 and his determination must be sustained unless that discretion has been abused. *Grenada Industries, Inc. v. Commissioner*, 17 T.C. 231 (1951), affd. 202 F.2d 873 (5th Cir. 1953). Petitioner generally bears the burden of proving that respondent abused his discretion in applying section 482. Petitioner therefore must prove that respondent abused his discretion in reducing the royalty payable under the 1961 and 1962 triazine license agreements from 10 percent to 6 percent. *Nat Harrison Associates, Inc. v. Commissioner*, 42 T.C. 601 (1964). Because respondent, in his amended answer, seeks to disallow the

---

[36]Sec. 482, as in effect for the years in issue, provides as follows:

"In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses."

previously allowed royalties paid by petitioner to Geigy-Basle, respondent bears the burden of establishing that no royalty should have been payable under the triazine licenses in issue. *Achiro v. Commissioner*, 77 T.C. 881, 890 (1981).

Basically, respondent asks us to apply a rather generalized facts and circumstance approach to the disposition of this case rather than a precise analysis under the relevant part of the section 482 regulations (sec. 1.482–2(d), Income Tax Regs.). Certainly a first glance at the continuing contacts between the Swiss and U.S. companies on the herbicide project first suggested by Dr. Ferguson in 1950 might lead one to suppose that the respective contributions of the two companies to the ultimate triazine discoveries were significant, and that the resulting patents were in substance, if not in legal fact, the joint property of both companies which they were equally entitled to exploit. Unfortunately for respondent's case, a closer scrutiny of the facts makes this supposition unsupportable insofar as petitioner's contribution is concerned.

By placing his main emphasis on his joint venture theory, respondent attempts to deflect the thrust of his own "Transfer or use of intangible property" regulations (cited *supra*) which to respondent's discomfiture fit this case like a glove. The evidence is overwhelmingly convincing that the success of the project (which produced 1963–69 net profits for petitioner after royalties—all subject to U.S. corporate income tax—of $227,119,000) was essentially attributable to Geigy-Basle. And it is upon the development of the triazine compounds, and not the exploitation of the U.S. market for them, that we must keep our attention focused. As the record amply makes clear, it was the foresightedness of Dr. Charles Koechlin (the chief executive officer of both Geigy-Basle and petitioner) in consistently encouraging the project, the imagination, energy, and scientific skills of Drs. Gysin and Kneusli in making the discoveries, and the imposing scientific resources, both in human and physical terms, which Geigy-Basle could bring to bear to support the necessary research, which made the project's almost unqualified success an eventuality.[37] Geigy-

---

[37] As stated in our findings of fact, by 1950, Geigy-Basle's research staff included approximately 50 Ph.D. synthetic chemical specialists and their support staffs. It was not until the mid-1950's that personnel at petitioner's laboratory (located in Bayonne, New Jersey) engaged in basic research, chemical synthesis, primary screening, or micronanalytical work.

Basle's scientific resources were imposing by any standards; petitioner's, in the early 1950's, did not exist.

It was evident from the outset of the project in 1951 that the research in question could not be attempted in the United States, although Dr. Ferguson initially suggested that it could be—at an annual budget of $30,000. Petitioner's contribution to the research, centered wholly in the essentially duplicative testing by Dr. Antognini, in Bayonne, of compounds chemically formulated and simultaneously tested biologically in Switzerland, was peripheral at best. We return to a discussion of this point subsequently herein.

In his fallback position, respondent argues that if we do find the intangible property regulations (sec. 1.482–2(d), Income Tax Regs.) to be applicable, then we should determine "an appropriate arm's length royalty." Although respondent's deficiency notice determined a 6-percent rate of royalty, on brief he does not specify what he now deems to be an appropriate arm's-length royalty, except that it should be "a royalty rate substantially below the range of the industry norm of about 5 percent if an exclusive license was granted and approximately one-half that for a non-exclusive license." If we decipher that language correctly, respondent suggests a rate of 3¾ percent.

Section 1.482–2(d), Income Tax Regs., provides a framework for determining an arm's-length consideration for the transfer, sale, assignment, or loan of intangible property or an interest therein between members of a group of controlled entities. Section 1.482–2(d)(3)(ii)(a), Income Tax Regs., specifically identifies "patents" as intangible property. We therefore will apply section 1.482–2(d), Income Tax Regs., in making our inquiry as to an arm's-length consideration for the rights petitioner received under Geigy-Basle's U.S. triazine patents.

Section 1.482–2(d)(2)(ii), Income Tax Regs., defines an arm's-length consideration as "the amount that would have been paid by an unrelated party for the same intangible property under the same circumstances." The above section further provides that the best indication of an arm's-length consideration is the amount paid by an unrelated party for transfers involving the same or similar intangible property under the same or similar circumstances. In the absence of a sufficiently similar transaction involving an unrelated party, section

1.482–2(d)(2)(iii), Income Tax Regs., lists the following factors as relevant in determining the amount of an arm's-length consideration:

(a) The prevailing rates in the same industry or for similar property,

(b) The offers of competing transferors or the bids of competing transferees,

(c) The terms of the transfer, including limitations on the geographic area covered and the exclusive or non-exclusive character of any rights granted,

(d) The uniqueness of the property and the period for which it is likely to remain unique,

(e) The degree and duration of protection afforded to the property under the laws of the relevant countries,

(f) Value of services rendered by the transferor to the transferee in connection with the transfer within the meaning of paragraph (b)(8) of this section,

(g) Prospective profits to be realized or costs to be saved by the transferee through its use or subsequent transfer of the property,

(h) The capital investment and starting up expenses required of the transferee,

(i) The next subdivision is (j),

(j) The availability of substitutes for the property transferred,

(k) The arm's length rates and prices paid by unrelated parties where the property is resold or sublicensed to such parties,

(l) The costs incurred by the transferor in developing the property, and

(m) Any other fact or circumstance which unrelated parties would have been likely to consider in determining the amount of an arm's length consideration for the property.

We therefore must first determine whether the record contains a sufficiently similar transaction involving an unrelated party.

Petitioner points to the license agreements entered into between Geigy-Basle and Norddeutsche Affinerie of Germany and Orgachemia of Holland as transfers involving the same or similar intangible property under the same or similar circumstances. Respondent disagrees, arguing that the license agreement entered into between Geigy-Basle and VEB Farbenfabrik Wolfen (Wolfen) of East Germany is the only sufficiently similar transaction involving an unrelated party. For the reasons stated below, we disagree with both parties.

Geigy-Basle granted Norddeutsche Affinerie the nonexclusive right to formulate and sell simazine and atrazine in Germany. Orgachemia received the exclusive right to formulate and sell simazine, atrazine, and propazine in the Netherlands, Belgium, and Luxembourg, and the nonexclusive right

to formulate and sell those herbicides in Indonesia. In return, Norddeutsche Affinerie and Orgachemia agreed to pay Geigy-Basle a royalty of 5 percent and to purchase the active ingredients for the triazine herbicides from Geigy-Basle.

Petitioner argues that, because the markup on the sale of the active ingredients plus the 5-percent royalty at least equals the 10-percent royalty paid by them, these third-party license agreements confirm the arm's-length nature of the royalty payments in issue.

Although we agree that these third-party license agreements represent transfers involving "the same or similar intangible property," we do not believe that these transfers occurred under "the same or similar circumstances" as the transfers at issue in the instant case. Unlike the licenses herein granting petitioner the right to manufacture the active ingredients for the triazine herbicides, the license agreements with Norddeutsche Affinerie and Orgachemia require them to purchase the active ingredients for the triazine herbicides from Geigy-Basle. Thus, petitioner was required to make substantial capital investments and assume large risks in connection with the production of the active ingredients for the triazine herbicides (see pp. 207–208, *supra*), while Norddeutsche Affinerie and Orgachemia were afforded the relatively risk-free obligation of only having to purchase the triazine herbicides that they sold. We therefore find that these third-party licenses are not "sufficiently similar transactions" as contemplated by section 1.482–2(d)(2)(ii), Income Tax Regs.

It might be argued that petitioner's obligation to make substantial capital investments and assume large risks militates in favor of a royalty rate no greater than the Orgachemia 5-percent rate and that this factor supports respondent's case. This "same or similar" factor is neutralized, however (as we discuss *infra* at pp. 229–230), by the more than offsetting increased profits generated by petitioner's capital investment in six cyanuric chloride manufacturing units constructed by petitioner from 1959 through 1968 pursuant to the provisions of the relevant agreements which permitted petitioner to manufacture the active ingredients of the triazine compounds. These augmented profits far exceeded the capital costs of producing them.

Respondent argues that the license agreements entered into between Geigy-Basle and Wolfen are sufficiently similar to the license agreements in issue to establish an arm's-length consideration. In 1959, Wolfen agreed to pay Geigy-Basle a royalty of 6 percent of net sales for the right to manufacture, formulate, and sell simazine in East Germany. In 1962, the parties entered into a similar agreement with respect to atrazine. The record, however, contains no evidence supporting respondent's contention that the Wolfen license was granted under circumstances similar to those existing when the triazine licenses in issue were granted. Indeed, respondent admitted on brief that "the totality of circumstances surrounding the negotiation of [the Wolfen] license are unclear." In the absence of evidence establishing that the Wolfen license was granted under circumstances similar to the instant case, we refuse to rely on this agreement as evidence of an arm's-length consideration.

Having found that the record does not contain a sufficiently similar transaction involving an unrelated party, we must look to the relevant factors identified by section 1.482–2(d)(2)(iii ), Income tax Regs. Section 1.482–2(d)(2)(iii)(*b*), Income Tax Regs., provides that we may consider "the offers of competing transferors or the bids of competing transferees" in arriving at the amount of an arm's-length consideration. In 1957 and 1958, Albert Griggs (Griggs), a senior patent attorney for Du Pont's industrial and chemical department, negotiated with Geigy-Basle on Du Pont's behalf. On both occasions, Du Pont offered to pay Geigy-Basle a royalty of 10 to 12.5 percent of net sales for the nonexclusive right to manufacture, formulate, and sell the triazine herbicides in the United States. Although Geigy-Basle eventually rejected Du Pont's offer, we are satisfied that this offer is highly probative of the amount an unrelated party would have paid for the same intangible property under similar circumstances.

Respondent argues that Griggs did not have the authority to commit Du Pont to a certain royalty rate. Respondent contends that Du Pont required its patent board to approve all licensing agreements. Respondent thus concludes that because Du Pont's patent board never approved Griggs' offer, we should not rely on this offer as indicative of an arm's-length consideration. We are unpersuaded by this argument.

Although Griggs agreed that Du Pont required its patent board to approve all license agreements, he testified that the board's approval was a mere formality. Griggs noted that prior to the negotiations with Geigy-Basle, he had committed Du Pont to numerous licensing agreements. He also stated that he had never submitted an agreement to the board that was questioned or turned down because of the royalty rate included in the patent license. Indeed, Griggs testified that he could have offered to pay a royalty of 15 percent for the triazine patent license without obtaining the prior consent of Du Pont's management.

We find Griggs' testimony candid, forthright, and credible. Consequently, we are convinced that Du Pont's offer to pay at least 10 percent for a license under Geigy-Basle's triazine patent was bonafide and therefore establishes that an unrelated party would have paid a royalty of at least 10 percent for the triazine agreements in issue. In so holding, we note that Griggs' authorization to offer a royalty of 15 percent for a triazine license is sufficient to overcome respondent's contention that Griggs' offer of 10 percent was not bonafide. The record, however, contains no evidence that Du Pont actually offered 15 percent for a triazine license. We therefore do not find this testimony sufficient to support petitioner's contention that a royalty of 15 percent constituted an arm's-length consideration.

The profit potential of the triazine herbicides is further evidence that a royalty of 10 percent constituted an arm's-length consideration for the exclusive right to manufacture, formulate, and sell the triazine herbicides in the United States. Sec. 1.482-2(d)(2)(iii)(g), Income Tax Regs. In the late 1950's, independent researchers throughout the United States described the triazine herbicides, especially simazine and atrazine, as more effective than any other corn herbicide available in the United States. In 1958, based on the triazines' superiority as corn herbicides petitioner's management projected that, by 1962, the sales of simazine and atrazine would reach $2 million and $4 million, respectively. Petitioner's management also projected that the triazine herbicides' low production costs would result in a gross profit percentage with respect to triazine sales of almost 80 percent.

By 1961 and 1962, when petitioner entered into the consolidated license agreements in issue, the sales performance of the triazine herbicides had confirmed their projected profitability. In 1961, petitioner experienced simazine and atrazine sales of $1,576,000 and $7,339,000, respectively. Despite substantial capital expenditures in that year to purchase equipment to produce the active ingredients for the herbicides, petitioner realized net profits after royalties of $1,033,000 from the sale of simazine and atrazine in the United States. By 1962, petitioner's net profits after royalties totaled $3,760,000 on sales of simazine and atrazine in the United States.

After 1962, the sales volume and profitability of the triazine herbicides exceeded petitioner's initial projections. From 1963 through 1969, petitioner earned net profits after royalties of $227,119,000 from the sale of simazine and atrazine in the United States. Thus, we are convinced that at the time petitioner and Geigy-Basle entered into the triazine agreements in issue (1961 and 1962), an unrelated third party would have been willing to pay a royalty of 10 percent for similar triazine licenses in light of the triazines' program as well as projected profitability. Indeed, Du Pont recognized the substantial profit potential of the triazines as early as 1958 when it offered a royalty of at least 10 percent for a similar triazine license.

A third factor which may be considered in determining the amount of an arm's-length consideration is "the prevailing rates in the same industry." Sec. 1.482–2(d)(2)(iii)(a), Income Tax Regs. Respondent argues that because prevailing rates for an exclusive license in the agricultural chemistry industry ranged from 3 to 6 percent of net sales during the 1950's, a royalty of 10 percent for an agricultural chemical product could not constitute an arm's-length consideration. Assuming that 3 to 6 percent represents a royalty norm for the agricultural chemical industry during the 1950's, we are nevertheless unpersuaded by respondent's argument.

A norm represents an industry average. Reports from various research facilities throughout the world during the 1950's, however, established that the triazine herbicides did not represent an average product in the agricultural chemical industry. Both petitioner and Geigy-Basle projected the enormous profit potential of the triazine herbicides prior to

entering into the license agreements in issue. Indeed, the triazines' actual profitability by the time of the relevant agreements far exceeded petitioner's most optimistic projections.

Moreover, respondent repeatedly emphasized throughout his briefs that, as a rule of thumb, a royalty rate generally divides net profits before royalties 25 to 75 percent between the licensor and licensee, respectively. From 1958 to 1969, petitioner earned net profits before royalties of $287,028,000 from the sale of simazine and atrazine in the United States. During this same period, petitioner paid royalties of $55,813,000 to Geigy-Basle, pursuant to the simazine and atrazine license agreement in issue. Consequently, petitioner retained more than 80 percent of the net profits before royalties earned from the sale of simazine and atrazine in the United States. Thus, under the rule of thumb emphasized by respondent, petitioner retained more than a reasonable amount of net profits from the sale of the triazine herbicides.

Section 1.482–2(d)(2)(iii)(*h*), Income Tax Regs., provides that "The capital investment and starting up expenses required of the transferee" is another factor which should be considered when arriving at the amount of an arm's-length consideration. Respondent contends that a 10-percent royalty failed to reflect the amount of capital petitioner anticipated investing in equipment to manufacture cyanuric chloride, an active ingredient of the triazine herbicides. We disagree.

In 1960, petitioner paid $943,136 to construct its first cyanuric chloride manufacturing unit. In 1957, it had been estimated that petitioner's production of cyanuric chloride would reduce the triazines' manufacturing costs by approximately 50 cents per pound. Based on a 1958 estimate that simazine sales alone would reach 10 to 15 million pounds within a few years, petitioner's production of cyanuric chloride would result in additional profits of at least $5 million to $7 million, annually. Under the triazine license agreements in issue, petitioner would retain 90 percent of these additional profits. On the record before us, we are convinced that an unrelated third party would have considered these additional profits a more than adequate return on its investment after paying a royalty of 10 percent to Geigy-Basle.

Indeed, as a result of the triazines' commercial success, petitioner constructed six cyanuric chloride manufacturing units from 1959 through 1968 at a cost in excess of $14 million. From 1959 through 1969, petitioner sold 221,866,789 pounds of simazine and atrazine. Thus, petitioner realized additional profits of at least $99,840,055 from its $14 million investment. Consequently, we are convinced that the 10-percent royalty adequately reflects petitioner's anticipated capital expenditures with respect to the production of cyanuric chloride.

Having determined that a royalty of 10 percent constitutes an arm's-length consideration under the factors identified in section 1.482–2(d)(2)(iii), Income Tax Regs., we now return to respondent's principal argument that in 1951, petitioner and Geigy-Basle entered into a joint research project to develop new herbicides and defoliants. Respondent maintains that petitioner's agreement, at an October 2, 1951, meeting attended by representatives from both petitioner and Geigy-Basle, to perform, without compensation, parallel screening and field testing of certain chemical compounds synthesized by Geigy-Basle and to assume responsibility for the U.S. label registration of any patentable compounds subsequently discovered, establishes the existence of a joint research and development project between petitioner and Geigy-Basle.[38]

Respondent's argument, while ardently propounded, is a valiant effort to make bricks without straw. The record simply does not support the proposition that petitioner contributed significantly to the research that led to the successful development of the triazine compounds. Respondent contends that the relevant inquiry is how unrelated members of a joint research and development project dealing at arm's length would have agreed to share the potential benefit of their joint effort in 1951. Based on the facts that existed in 1951, respondent concludes that it would have been reasonable for petitioner and Geigy-Basle to share the potential benefits on the basis of a royalty-free geographical division of world-wide markets, petitioner receiving the U.S. market. Respondent's argument

---

[38]We note that although respondent's regulations deal specifically with a "bonafide cost sharing arrangement" under a section entitled "Sharing of costs and risks" (sec. 1.482–2(d)(4), Income Tax Regs.), respondent makes no mention of this section in his brief. The regulation does not permit *taxpayers* to claim to have entered into a cost sharing arrangement unless the arrangement has been reduced to writing.

might have merit if his premise that petitioner and Geigy-Basle entered into a joint research and development project were sound. For the reasons stated below, however, we are not convinced that petitioner and Geigy-Basle entered into such a project in 1951.

Petitioner's agreement to perform certain services without compensation does not create a joint research and development project entitling petitioner to receive the royalty-free right to manufacture, formulate, and sell the triazine herbicides in the United States. Respondent does not contend, nor does the record contain any evidence, that petitioner and Geigy-Basle expressly agreed to share the costs and potential benefits of the herbicide-defoliant project. Cf. sec. 1.482–2(d)(4) (Sharing of Costs and Risks). Rather, respondent contends that we should imply these terms from the parties' course of conduct pursuant to an arm's-length standard. In the absence of more persuasive evidence that petitioner and Geigy-Basle impliedly intended to share the costs and benefits of developing new herbicides and defoliants, we refuse to write a joint venture agreement for them.

We nevertheless agree that petitioner did not receive compensation from Geigy-Basle for the performance of certain services in connection with field testing, parallel screening, and registration of the triazine herbicides in the United States. Section 1.482–2(d)(1)(ii)(b), Income Tax Regs., however, specifically addresses the allocation of an arm's-length consideration for the performance of services in connection with an attempt to develop intangible property. Section 1.482–2(d)(1)(ii)(b), Income Tax Regs., provides as follows:

> Where one member of a group renders assistance in the form of * * * services * * * to a developer in connection with an attempt to develop intangible property, the amount of any allocation that may be appropriate with respect to such assistance shall be determined in accordance with the rules of the appropriate paragraph or paragraphs of this section.

Thus, if we determine that Geigy-Basle was the developer of the U.S. triazine patent, we must look to section 1.482–2(b) (Performance of services for another), Income Tax Regs., to determine the amount, if any, we should allocate as an arm's-length charge for services rendered by petitioner in connection with the development of the triazine herbicides.

Section 1.482–2(d)(1)(ii)(*c*), Income Tax Regs., provides that:

The determination as to which member of a group of related entities is a developer and which members of the group are rendering assistance to the developer in connection with its development activities shall be based upon all the facts and circumstances of the individual case. Of all the facts and circumstances to be taken into account in making this determination, greatest weight shall be given to the relative amounts of all the direct and indirect costs of development and the corresponding risks of development borne by the various members of the group * * *. Other factors that may be relevant * * * include the location of the development activity, the capabilities of the various members to carry on the project independently, and the degree of control over the project exercised by the various members.

Relying on the factors identified above, we find that Geigy-Basle was the developer of the U.S. triazine patent.

Although the record contains little evidence of the relative costs and corresponding risks borne by petitioner and Geigy-Basle in the development of the triazine compounds, the overall planning and supervision of the herbicide development, the synthesis of the chemical compounds and a very substantial part of the biological screening of those compounds occurred in Switzerland. And, although petitioner performed some biological screening and field testing in the United States, the significant development activities, including biological screening, were performed by Geigy-Basle in Switzerland.

Moreover, only Geigy-Basle was capable during the development years of independently carrying on the development of new herbicides. Geigy-Basle could have contracted with one of several U.S. companies to perform biological screening at a modest cost. See discussion *infra*. In addition, potential third-party licensees would have performed field testing and assumed responsibility for U.S. label registration of any commercially promising compound. Indeed, the parties stipulated that Geigy-Basle "had all the facilities and services needed to undertake a research project in the herbicide field." The record establishes, however, that petitioner possessed neither the laboratory facilities nor the personnel needed to undertake a herbicide development project during the 1950's.

Finally, Geigy-Basle planned the synthesis program, selected the chemical compounds to be screened for biological activity, and determined which compounds would be commer-

cialized. Thus, Geigy-Basle exercised full control over the research and development of the triazine herbicides.

Consequently, we find that Geigy-Basle was the developer of the U.S. patents for the triazine herbicides.

Having determined that Geigy-Basle was the developer of the U.S. patent for the triazine herbicides, we now turn to section 1.483–2(b), Income Tax Regs., to determine the appropriate allocations to reflect an arm's-length charge for petitioner's services. Section 1.482–2(b)(1), Income Tax Regs., provides:

Where one member of a group of controlled entities performs marketing, managerial, administrative, technical, or other services for the benefit of, or on behalf of another member of the group without charge, or at a charge which is not equal to an arm's length charge as defined in subparagraph (3) of this paragraph [Section 1.482–2(b)(3), Income Tax Regs.], the district director may make appropriate allocations to reflect an arm's length charge for such services.

Section 1.482–2(b)(2), Income Tax Regs., in relevant part provides:

(2) *Benefit test.* (i) Allocations may be made to reflect arm's length charges with respect to services undertaken for the joint benefit of the members of a group of controlled entities, as well as with respect to services performed by one member of the group exclusively for the benefit of another member of the group. Any allocations made shall be consistent with the relative benefits intended from the services, based upon the facts known at the time the services were rendered, and *shall be made even if the potential benefits anticipated are not realized.* * * * [Emphasis added.]

Section 1.482–2(b)(3), Income Tax Regs., defines an arm's-length charge for services rendered as "the amount which was charged or would have been charged for the same or similar services in independent transactions with or between related parties under similar circumstances considering all relevant facts." Section 1.482–2(b)(2)(ii), Income Tax Regs., states, however, that:

Allocations will generally not be made if the service is merely a duplication of a service which the related party has independently performed or is performing for itself. In this connection, the ability to independently perform the service (in terms of qualification and availability of personnel) shall be taken into account.

Consideration of the entire record leads us to conclude that as events unfolded the screening performed by Dr. Antognini proved in fact to be a duplication, but at the time the herbicide project began, both Geigy-Basle and petitioner thought the biological screening in New York would be useful. Nevertheless, petitioner's contribution to the ultimate development of the triazine compounds was extremely circumscribed.

The record reveals that Joe Antognini was a doctoral candidate at Cornell in May or June of 1950 when he was hired to perform biological testing of the compounds to be sent to him from Basle. The tests which he perfectly competently performed were nonetheless standard tests which were in no way innovative or unique, and could equally well have been performed on a contract basis by an independent laboratory such as the Boyce Thompson Institute whose director, Dr. Torgeson, testified at trial.

Dr. Antognini performed his tests in the Bayonne laboratory in almost complete isolation from the ongoing research in Basle. He never visited the research facilities in Basle. He testified that he never conferred by telephone with anyone in Basle. By contrast Dr. Gast, the eminently skilled and experienced biologist in Basle, conferred constantly with Drs. Kneusli and Gysin. If for no other reason, this followed from Dr. Gast's close physical proximity to the two research chemists and their staffs.

Dr. Antognini forwarded his reports to Basle by mail, but the testimony of various witnesses at the trial on this point, which we found entirely consistent and credible, reflects a pattern of rapidly ongoing progress in the triazine research, unhampered by the inevitable delays in delivery of Dr. Antognini's reports.

In a February 2, 1960, speech, Dr. Gysin stated that "We used this double-check procedure for more than two years when it became evident that the agreement between the test-laboratories had reached such a perfection that we could give up the screening work in New York." The screening results of the tests performed by Dr. Antognini in the United States and Dr. Gast in Switzerland were very similar. Both scientists used well-established screening methods designed to discover chemical compounds exhibiting herbicidal activity. Although petitioner and Geigy-Basle did not use identical test methods, Dr.

Melville Hillman, respondent's expert witness, testified that "in all of the really important cases, Gast and Antognini agreed."

Indeed, because of the similarity of the screening results, Dr. Antognini terminated his screening activities in 1955 and left the employ of petitioner. A 1955 annual report for the herbicide-defoliant program explained the basis for the decision as follows:

> This decision was based on the fact that the screening results from Bayonne and Switzerland were so closely in line that it was felt that time and expense could be saved if only one laboratory did the screening.

Dr. Torgeson, director of pesticide screening at the Boyce Thompson Institute, testified at trial that he believed duplication screening tests "would be redundant, almost a waste of resources to do so."

In addition to performance of the double check referred to by Dr. Gysin in his speech, Dr. Antognini's tests formed the basis for a few examples in the Swiss and U.S. patent applications, although most of the examples derived from Dr. Gast's tests. Dr. Antognini also was the first to note the epinastic effect of chlorazine on certain plants tested by him.

There was testimony at the trial to the effect that the Boyce Thompson Institute would have tested the compounds which Dr. Antognini tested at a cost of between $30 and $50 per compound. It also appears that Dr. Antognini tested approximately 425 compounds in connection with his primary screening and an additional 172 compounds in connection with his secondary screens. As previously stated, Treas. Regs. section 1.482–2(b)(2)(i) provides that allocations may be to reflect arm's-length charges with respect to services undertaken for the joint benefit of the members of a group of controlled entities. This section of the regulations permits such an allocation "even if the potential benefits anticipated are not realized." Section 1.482–2(b)(2)(i) of the regulations provides that allocations will *generally* not be made for services which are duplicative, but we assume this recognizes that in some situations some allocation should be made in spite of duplication.

In any event, notwithstanding the fact that the services performed by Dr. Antognini eventually proved to be duplica-

tive and of limited overall significance, we think some allocation should be made to reflect these services. In the absence of concrete cost data, and using our best judgment based upon our evaluation of all of the relevant facts and circumstances, we find that $100,000 should be allocated as petitioner's contribution to the development of the licensed triazine compounds. We further hold that the value of these services should be allocated equally between the 1961 and 1962 licenses over the respective terms thereof, as setoffs against royalty payments thereunder.

With respect to field testing and petitioner's work to obtain label registration in the United States, the record establishes that a third-party licensee under similar circumstances would not have received compensation for the performance of these services. Mr. Griggs of Du Pont testified at trial that if his company had received a license under the triazine patents in exchange for a royalty of 10 percent, Du Pont would have performed field testing and any work necessary to obtain U.S. label registration for the triazines at its own expense. Griggs explained that "a good deal of the inducement which we had for Geigy to work with us, was our capability to test, to get clearance by the Food and Drug Administration, to get the product on the market. That was what we had to offer."

Moreover, Du Pont's willingness to perform these services without compensation was typical of the policies and practices of the agricultural chemical industry. In the 1950's, it was standard practice for licensees of pesticide products to carry out or coordinate all the development work necessary for commercialization of the products in their respective markets. Licensees were generally responsible for field testing and any additional work necessary to obtain label registration in their respective markets, all at their own expense. Indeed, the record contains numerous examples of prospective third-party licensees under the triazine patents, performing field tests and other work necessary to obtain label registration at their own expense. Accordingly, we are convinced that a potential third-party licensee would not have received compensation for services performed in connection with field testing and label registration in the United States.

In conclusion, for the reasons stated above, we find that petitioner has satisfied its heavy burden of proving that

respondent's reduction of the royalty from 10 percent to 6 percent paid by petitioner during the years in issue constituted an abuse of discretion, and that respondent has failed to carry his burden of proving that no royalty payment is allowable. On the record before us, however, we decline to find that a royalty in excess of 10 percent would constitute an arm's-length consideration. The testimony of representatives for both petitioner and Geigy-Basle was that the parties ultimately agreed to a 10-percent royalty rate only after engaging in substantial negotiations. We perceive no reason to gainsay that testimony by modifying the terms of an agreement which resulted from the parties' self-styled good-faith bargaining.[39] Furthermore, as abundantly demonstrated, the 10-percent royalty is completely consistent with the testimony of Mr. Griggs of Du Pont subject only to the $100,000 allocation for services performed by petitioner previously discussed.

To reflect the foregoing and prior concessions,

*Decision will be entered under Rule 155.*

---

[39]At trial, respondent attempted to introduce into evidence petitioner's post-trial brief submitted in *Ciba-Geigy Corp. v. Farmland Industries, Inc.*, an administrative proceeding brought by petitioner before the Environmental Protection Agency. Because we found the possibility of prejudice outweighed the brief's potential usefulness, we refused to admit the brief into evidence. On brief, respondent argues that our ruling was erroneous. Having ruled on the admissibility of the brief at trial, we need not and do not reconsider the admissibility of the brief here. In so holding, we note that the brief, at best, would have been admissible for impeachment purposes. Respondent, however, repeatedly offered the brief as substantive evidence of the facts contained therein.